Stephen A. SOLOMON, TRV Holding Co., Melvin Ward, Caran E. Weinstein, Andrea Goldfarb, Trustees for the Eisenberg Children's Irrevocable Trust II, Plaintiffs,

v.

Anne L. ARMSTRONG, John H. Bryan, Wallace W. Creek, Thomas E. Everhart, Charles T. Fisher, III, William E. Hoglund, James P. Humphrey, J. Michael Losh, L. Willard Marriott, Jr., Ann D. McLaughlin, Paul H. O'Neill, Harry J. Pearce, Edmund T.

Pratt, Jr., John G. Smale, John F. Smith, Jr., Louis W. Sullivan, Dennis Weatherstone, Thomas H. Wyman, General Motors Corp., and Electronic Data Systems Holding Corporation, Defendants.

Civil Action No. 13515.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 16, 1998.
Decided: March 25, 1999.

Pamela S. Tikellis and Robert J. Kriner, Jr., of Chimicles & Tikellis LLP, Wilmington, DE; Irving Morris, of Morris and Morris, Wilmington, DE; Biggs & Battaglia, Wilmington, DE; of Counsel: Jeffrey C. Zwerling and Richard A. Speirs, of Zwerling, Schachter & Zwerling LLP, New York City; Joseph V. Sternberg, of Goodkind Labaton Rudoff & Sucharow LLP, New York City; Bizar Martin & Taub LLP, New York City; A. Arnold Gershon, P.C., New York City, for Plaintiffs.

R. Franklin Balotti and Lisa A. Schmidt, of Richards, Layton & Finger, Wilmington, DE; of Counsel: Robert J. Kopecky and Alex Dimitrief, of Kirkland & Ellis, Chicago, IL; Michael J. Basford, of (General Motors Corporation), Detroit, MI, for General Motors Corporation.

Michael Hanrahan and John H. Small, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE; of Counsel: Larry D. Carlson and Steve Schortgen, of Baker & Botts, L.L.P., Dallas, TX; G. Irvin Terrell and Joseph A. Cialone, II, of Baker & Botts, L.L.P., Houston, TX; Carol A. Jablonski, of (Electronic Data Systems Corporation), Plano, TX, for Nominal Defendant Electronic Data Systems Holding Corporation.

Grover C. Brown, of Morris, James, Hitchens & Williams, Wilmington, DE; of Counsel: Dennis J. Block, of Cadwalader, Wickersham & Taft, New York City; Stephen A. Radin, of Weil, Gotshal & Manges, LLP, New York City, for Defendants Anne L. Armstrong, John H. Bryan, Wallace W. Creek, Thomas E. Everhart, Charles T. Fisher III, William E. Hoglund, James P. Humphrey, J. Michael Losh, J. Willard Marriott, Jr., Ann D. McLaughlin, Paul H. O'Neill, Harry J. Pearce, Edmund T. Pratt, Jr., John G. Smale, John F. Smith, Jr., Louis W. Sullivan, Dennis Weatherstone and Thomas H. Wyman.

*OPINION*

CHANDLER, Chancellor.

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1106

II. PARTIES' CONTENTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1109
 A. PLAINTIFF'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1109
 B. DEFENDANTS' MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1110
 C. MOTION TO DISMISS STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1110

III. LAW OF THE DEAL: FIDUCIARY DUTY ISSUES . . . . . . . . . . . . . . . . . . . . . 1111
 A. THE BUSINESS JUDGMENT RULE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1111
 B. HEIGHTENED SCRUTINY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1112
 C. ENTIRE FAIRNESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1112
 D. SHAREHOLDER RATIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1113
 *1. Void Acts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1114
 *2. Voidable Acts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1114
 *3. The Duty of Loyalty and Ratification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1114

IV. APPLICATION OF THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1117
 A. GM'S ACTIONS AND THE BUSINESS JUDGMENT RULE . . . . . . . . . . . . . . . . . . . 1117
 B. TRANSACTION STRUCTURE CHALLENGE TO THE BUSINESS JUDGMENT RULE . . . . . . . 1120
 *1. A Freeze-Out By Any Other Name?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1120
 *2. Class Voting* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1121
 *3. Dividend Policy Protections* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1121
 *4. Capital Stock Committee* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122
 *5. "Forced Merger" Potential* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122
 C. THE EFFECT OF THE WHOLLY-OWNED SUBSIDIARY FORMS . . . . . . . . . . . . . . . . 1123
 *1. The Reasonableness of The Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1124
 *2. Shareholder Ratification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1127
 *3. Disclosure Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1127
 a. Misleading Base Case Scenario Claims . . . . . . . . . . . . . . . . . . . . . . . . 1129
 b. Illusory Claimed Benefits Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1130
 c. Increased Vulnerability Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1130
 d. Wrongful Coercion Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1131
 D. COUNT II—BREACH OF CONTRACT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1133

This case involves General Motors Corporation's decision to split-off its former subsidiary Electronic Data Systems Holding Corporation. It raises an interesting question: What happens when a corporation decides that it no longer wants to own a line of business represented by a tracking stock?

Most corporations that go through fundamental corporate governance changes can protect their decisions by perfecting a fair process. The claims asserted here raise questions about the process that General Motors created and the effects of shareholder ratification, questions that re-

quire application of several principles of Delaware's fiduciary duty law.

For the reasons stated below, I grant in full defendants' motion to dismiss plaintiffs' complaint. Part I of this Opinion sets out the factual circumstances that gave rise to this lawsuit. Part II delineates the plaintiffs' claims, the defendants responses to those claims, and the standard to be applied at this stage of the proceedings. Part III describes, in broad terms, the legal principles and the differing standards of judicial review that apply to particular types of corporate governance issues under Delaware Law. Part IV then applies those principles to the breach of loyalty, disclosure violation, and breach of contract claims asserted against GM and its directors. Finally, Part V summarizes the conclusion.

## I. BACKGROUND

On June 7, 1996, General Motors Corporation ("GM"), a Delaware corporation, effected a split-off of its wholly-owned subsidiary, Electronic Data Systems Holding Corporation ("EDS"). The terms of the transaction provided for: 1) an exchange of GM Class E shares for EDS shares on a one-to-one basis; 2) new information technology service agreements, including a new master services agreement between GM and EDS; and 3) a $500 million lump sum cash transfer payment from EDS to GM.

Before the split-off, as provided by GM's certificate of incorporation, GM had three classes of common stock: GM 1–2/3 common stock, GM Class E common stock, and GM Class H common stock. The latter two classes of stock, so-called tracking

stocks, derived their value from the GM operations to which they were tied. While dividends payable to holders of GM 1–2/3 common stock were based on GM's total income, dividends payable to holders of Class E common stock were tied to EDS's income, and dividends payable to holders of Class H common stock were based upon the income of GM's wholly-owned subsidiary, GM Hughes Electronics Corp.[1] The certificate of incorporation and by-laws provided for a formulaic system to ensure a proper accounting of earnings attributable to each stock.

Among other special provisions under the terms of GM's certificate of incorporation, Class E stockholders were entitled to vote as a class on any matter that might adversely affect their interests. Furthermore, Class E stockholders were entitled to receive GM stock equal to 120 percent of the ratio of the average market price per share of the Class E Stock on a specified valuation date to the average market price per share of GM stock on that same date (hereinafter referred to as the "Exchange Rate"), in the event of a recapitalization, sale, transfer, assignment, or other disposition of EDS to any entity of which GM was not a majority owner.[2]

On August 7, 1995, GM announced that it planned to pursue a split-off of EDS to holders of GM Class E common stock. GM determined that it would only consummate a transaction that was tax-free and that would not trigger the Exchange Rate.[3] Under GM bylaws, a sub-committee of GM directors, the Capital Stock Committee (or the "Committee")[4] was charged with charting a course for the split-off. The purported aim of the Com-

---

**1.** Third Am. Compl. at ¶¶ 41–45. For a closely related case dealing with the split-off of GM's Class H common stock see *In re General Motors Class H Shareholders Litig.*, 734 A.2d 611 (1999) (Mem.Op.).

**2.** Third Am. Compl. at ¶¶ 29–31.

**3.** I note in passing that "as a result of the [s]plit-off, the [GM] Certificate [of incorpo-

ration] would be amended to delete references to Class E Stock, including the Recapitalization Right." *Id.* at ¶ 102.

**4.** The Capital Stock Committee was comprised of the following GM directors: Wyman, Bryan, McLaughlin, Smale, and Weatherstone.

mittee was to structure a process that would protect the interests of all of GM's various classes of shareholders.

Undoubtedly at the suggestion of its own independent counsel,[5] the Committee put together two management teams, one consisting of GM officers (the "GM team"), two of whom also served as EDS directors, and the other consisting of EDS officers (the "EDS team"), which were charged with negotiating the terms and conditions of the split-off. The GM team was responsible for negotiating the terms on behalf of the holders of GM 1–2/3 common stock and GM Class H common stock. The GM team was authorized to use the assistance of GM's treasurer's office staff and legal staff, and also engaged outside counsel Kirkland & Ellis, Richards, Layton & Finger, Milbank, Tweed, Hadley & McCloy, and—as financial advisor—Merrill Lynch, Pierce, Fenner & Smith, Inc. The EDS team was responsible for negotiating the terms of the transaction from the perspective of the holders of GM Class E common stock. The EDS team was authorized to use its own financial and legal staffs, and also engaged outside counsel Baker and Botts, L.L.P., Prickett, Jones, Elliot, Kristol & Schnee, and Hughes & Luce, L.L.P., and—as financial advisors—Lehman Brothers, Inc. ("Lehman Brothers") and later Morgan Stanley & Co. ("Morgan Stanley").[6] At oral argument plaintiffs' counsel informed the Court that the advice of all the financial advisors was paid for by GM.

Negotiations commenced between the teams on various issues, but they first focused on arguably the most material area: changes to existing information technology ("IT") agreements between GM and EDS. Initially, the EDS team determined that no material changes were needed to the existing IT agreements other than those specifically necessitated by the fact that EDS and GM were to become totally independent companies.[7] The GM team insisted that the existing IT terms be renegotiated so as to afford GM better rates than provided in the then-existing agreements.[8] The two sides maintained their diametrically opposed positions.

Enter the Capital Stock Committee, which during its November 5, 1995 meeting determined that the negotiating teams needed "guidance." [9] In deciding to insert itself into the negotiation process the Capital Stock Committee suggested that the GM board promulgate a series of directives. Perhaps most significantly in terms of my later analysis in this Opinion, the Committee recommended to the GM board that the negotiations should follow certain guidelines including, among others, that GM should take over from EDS the principal role of developing and supervising GM's IT strategy and programs, and that the new IT service agreements should provide GM with greater ability to test the

---

5. Weil, Gotshal & Manges LLP ("Weil Gotshal") served as independent counsel to the Capital Stock Committee. *See* Defs.' Opening Br. Supp. Mot. Dismiss Third Am. Compl. App. Ex. 1 at 39 (GM's solicitation statement of Apr. 23, 1996, disseminated to shareholders in connection with GM's S–4 Registration Statement filed with the Securities and Exchange Commission—these disclosure materials were given to shareholders as a solicitation of written consent for approval of the transaction) (the "Consent Solicitation").

6. Plaintiffs also note: "In connection with the Split–Off, Morgan Stanley and Lehman Brothers were to receive a fee in the total amount of $7.5 million, $6.5 million of which was contingent upon consummation of the Split–Off. . . . In addition, Morgan Stanley and Lehman Brothers had performed substantial services for GM and EDS in the preceding two years for which they had received compensation in the total amount of approximately $27.4 million." Third Am. Compl. ¶ 47.

7. *Id.* at ¶ 50.

8. GM maintained this position notwithstanding the fact that a GM board committee had studied the EDS fees issue and concluded that GM was paying "roughly competitive rates." *Id.*

9. Consent Solicitation at 40.

competitiveness of the terms of any GM–EDS contract.[10] On November 6, 1995, the GM board approved the Committee's suggestions, and Weil Gotshal communicated to the negotiating teams. The GM board also voiced its desire that negotiations be expedited and directed the leaders of the negotiating teams to remain personally involved in the talks.

As negotiations progressed the GM team stressed that long-term reductions in GM's structural costs were required, whether or not the split-off was to occur. According to plaintiffs' complaint, the GM team contended that most of the cost-cutting issues on the bargaining table would have arisen even in the absence of the proposed split-off.[11] On November 20, 1995, GM decided to withhold from EDS certain unrelated payments for information processing activities pending the resolution of disputed amounts.[12] By December 4, 1995, Weil Gotshal reported to the GM board that, although some progress had been made, there was no resolution of significant substantive issues.

Next, during a December 18, 1995 GM board meeting, EDS executives proposed a number of anti-takeover provisions to the EDS certificate of incorporation. The GM board determined that it had no objection to the provisions, but refused to authorize such provisions until the negotiating teams had reached an agreement in principle on the material terms of the revised IT service agreements.[13] Negotiation over those agreements continued for the next three months and included, among a number of issues, the withheld payments due to EDS. By the beginning of March 1996 an agreement was reached with respect to most issues relating to the IT agreements. Thereafter, a few remaining issues were negotiated. Of notable importance were two: 1) the amount of an inter-company transfer payment from EDS to GM; and 2) the terms of future service agreements under the master services agreement ("MSA") which would govern the GM–EDS IT relationship going forward.

The EDS team took the position that there was no justification for an inter-company transfer, but if one was required, it should not exceed $250 million. The GM team felt that a payment between $750 million and $1.7 billion was merited. The two teams agreed on the variables under consideration with respect to the payment, but they held widely divergent estimates of the value of almost all of the factors.[14] Ultimately, the two teams made presentations of their positions to the Capital Stock Committee. Rather than resolving their disagreements on the various value estimates, the teams sought to reach a compromise that would allow both teams to recommend all of the terms of the proposed transactions taken as a whole. Thus, on March 1, 1996, without coming to a consensus on how an exact figure should be calculated, the teams agreed to a payment of $500 million.

The MSA was renegotiated in March 1996 and provided for significant changes of the GM–EDS future operating procedures. For purposes of the plaintiffs' claims, only a few alleged facts relating to the MSA are important. Plaintiffs allege that in order to recommend the terms of the transaction, the parties created what they referred to as a "base case scenario" to which the expected performance of EDS following the transaction would be compared. The base case scenario created a hypothetical set of sales, cost of doing

---

**10.** According to the Consent Solicitation, the competitiveness tests included giving GM the opportunity to hold competitive bidding on portions of its IT work and the ability to award contracts to non-EDS IT suppliers. See id. at 40.

**11.** Third Am. Compl. ¶ 53.

**12.** See id. at ¶¶ 52–55.

**13.** The anti-takeover provisions were ultimately adopted by EDS on March 12, 1996. See Consent Solicitation at 41.

**14.** Third Am. Compl. ¶ 62.

business, and earnings figures based upon the assumption that changes to the MSA would have occurred even absent the split-off. This scenario was meant to allow the comparison of what EDS's performance would have been absent the split-off for the purposes of forming recommendations by the financial advisors on the transaction.[15]

On March 22, 1996, the GM and EDS teams recommended to the Capital Stock Committee the terms of the split-off. The Capital Stock Committee unanimously adopted a resolution recommending that the full GM board proceed with the transaction. In the opinion of the Committee, it was in the best interests of, and fair to, GM and each class of GM stock. On March 31, 1996, the GM board approved the split-off, subject to the approval of a majority of the holders of each of: 1) the GM 1-2/3 common stock, voting separately as a class; 2) the GM Class E common stock, voting separately as a class; and 3) all classes of GM common stock, voting together. The GM board also agreed to recommend to the GM shareholders the terms of the split-off.

On April 1, 1996, GM announced approval of the split-off. Under the terms of the transaction, each outstanding share of Class E stock would be converted into one share of EDS common stock on a one-for-

one basis through a merger of GM with an indirect wholly-owned subsidiary of EDS organized for the purposes of the split-off. On May 1, 1996, GM and EDS filed an S-4 Registration Statement with the Securities and Exchange Commission (the "SEC") and disseminated disclosure materials in connection with a solicitation of written consent (the "Consent Solicitation") to all GM shareholders. On June 7, 1996, GM and EDS announced that they had obtained the necessary shareholder consents and consummated the split-off.

## II. PARTIES' CONTENTIONS

### A. Plaintiffs' Claims

Plaintiffs [16] challenge this transaction directly on behalf of a class of former GM shareholders and derivatively on behalf of EDS. The essence of plaintiffs' claims is that the director defendants [17] who negotiated and approved the split-off, and GM as a parent corporation, breached their fiduciary duties to plaintiffs in connection with both the split-off and the dissemination of materially misleading and coercive solicitations of written consents.

In their first and third counts, plaintiffs bring claims against the GM director defendants for breach of their fiduciary duties.[18] The first count, brought directly

15. *See* Consent Solicitation at 60.

16. Plaintiffs Stephen Solomon, TRV Holding Company, Melvin Ward, and Caran Eisenberg Weinstein and Andrea Goldfarb—Trustees for the Eisenberg Children's Irrevocable Trust II—owned Class E common stock at all times relevant to this litigation, including at the time of the split-off. By virtue of the split-off, plaintiffs became holders of EDS stock and continue to hold such stock.

17. The GM director defendants are: Anne L. Armstrong, John H. Bryan, Thomas E. Everhart, Charles T. Fisher III, William E. Hoglund, J. Willard Marriott, Ann D. McLaughlin, Edmund T. Pratt, John G. Smale, John F. Smith, Louis W. Sullivan, Dennis Weatherstone, Thomas H. Wyman, Paul H. O'Neill, and Harry J. Pearce. Hoglund and O'Neill resigned from the GM board on January 1, 1995, and November 6, 1995, respectively.

The other defendants, some of whom occupied their positions at the time of the transaction, are: James P. Humphrey, executive officer and director of EDS and chief accounting officer of GM; Wallace M. Creek, executive officer and director of EDS and comptroller of GM; J. Michael Losh, vice president and director of EDS and executive vice president and chief financial officer of GM; Harry J. Pearce president and director of EDS and executive vice president, vice chairman, and director of GM; and John F. Smith, director of EDS and president, chief executive officer, and a director of GM.

18. More particularly, plaintiffs allege that: 1) the structure of the split-off amounted to a self-dealing transaction; 2) the negotiation process did not provide a fair approximation of an arm's-length negotiation; 3) defendants misleadingly manipulated material information disseminated to shareholders; and 4) de-

on behalf of all Class E stockholders who became EDS shareholders as a result of the split-off (the "class"), alleges the breach of fiduciary duties of good faith, loyalty[19] and disclosure by unfairly and coercively determining the terms of the split-off and soliciting consents by means of a materially misleading, deficient and wrongfully coercive consent solicitation. The third count, brought derivatively on behalf of EDS, alleges the GM directors and the EDS directors similarly breached their fiduciary duties to EDS in connection with the split-off.

The second count, brought directly on behalf of the class, alleges that GM is liable for breach of contract by wrongfully depriving holders of GM Class E common stock of their right to a 120 percent recapitalization under GM's pre-split-off certificate of incorporation.

### B. Defendants' Motion to Dismiss

Defendants have moved to dismiss these claims, and offer the following arguments regarding the plaintiffs' first and third counts: 1) the exemption provision in GM's certificate of incorporation precludes liability for the claims asserted against GM's directors; 2) plaintiffs have failed to plead facts sufficient to overcome the presumption of the business judgment rule; and 3) the GM shareholders approved the terms of the split-off following full disclosure of all material facts and without wrongful coercion.[20] As to plaintiffs' third count, brought on behalf of EDS, defendants also assert that such claim should be dismissed because plaintiffs lack standing to sue derivatively.[21] Alternatively, defendants claim that plaintiffs failed to comply with Rule 23.1's pre-suit demand requirement. Finally, regarding the second count, defendants argue that plaintiffs fail to state a claim for breach of contract.

### C. Motion to Dismiss Standard

 In considering a motion to dismiss under Rule 12(b)(6), I am required to assume the truthfulness of all well-pleaded allegations of the complaint.[22] In addition, I am required to extend to plaintiffs "the benefit of all reasonable inferences" that

---

fendants failed to duly inform shareholders of the material fact that their consent amounted to the waiver of the Class E stock 120 percent recapitalization right.

**19.** Although plaintiffs allege that the members of the Capital Stock Committee owned disparate holdings of Class E stock compared to the other classes, thereby implicating their personal interests, those breach of loyalty claims fail as a matter of law because plaintiffs do not allege the materiality of the holdings with reference to those particular directors. *See infra* text at 1117–20. Plaintiffs also attempt to plead a structural loyalty claim *i.e.*, that a cognizable duty of loyalty claim exists by virtue of the inherent possibility that the interests of the Class E stockholders and the other GM stockholders could conflict, and that the GM board would have to resolve that conflict irrespective of the directors' potentially competing duties of loyalty to each shareholder group. Ultimately, plaintiffs fail on this claim as a matter of law as well. *See infra* text at 1120–24.

**20.** Because I ultimately find that plaintiffs' breach of fiduciary duty claims are extin-

guished by the valid shareholder ratification of the transaction, I do not reach defendants' remaining arguments relating to those claims.

**21.** Defendants urge that plaintiffs' derivative standing be denied for, among other reasons, the fact that plaintiffs determined not to seek relief in the form of a preliminary injunction. In light of the legal determinations in this case, as explained below, I do not reach the derivative standing issue. I note there is a possibility, however, that plaintiffs could have been limited in their remedy even if liability were properly established. *See, e.g., Schreiber v. Carney*, Del. Ch., 447 A.2d 17, 22 (1982)("[P]laintiff[s] had a remedy: to attempt to enjoin the [transaction] which occurred during the course of the litigation."); *see also Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 141 (1997) (pointing out that under certain circumstances, injunctive relief or corrective disclosure may be the only remedy available to shareholder plaintiffs).

**22.** *See Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

can be drawn from the complaint.[23] Under this analysis I cannot order a dismissal unless it is reasonably certain that the plaintiffs could not prevail under any set of facts that can be inferred from the complaint.[24] Consistent with these requirements, I accept as true all of the plaintiffs' properly pled allegations and have made every reasonable inference in their favor.[25]

## III. LAW OF THE DEAL: FIDUCIARY DUTY ISSUES

The nature and effect of the fiduciary relationship between directors and shareholders is the very bedrock of Delaware's corporate jurisprudence. A basic duty of fairness, i.e., the requirement to treat shareholders and their equity interest in the corporation fairly, is the broadest notion of the duties directors owe to the corporation's shareholders. The question becomes: how should a court proceed to conceive of the best way to protect shareholders' valid expectation that they will be dealt with fairly?

This question is complicated by a significant order of magnitude considering that, in this case, the directors' actions occur in the context of a complex governance structure which revolves around an equity instrument (i.e., a tracking stock) characterized by a peculiar separation between the economic interest it represents and the basic governance and control over the underlying assets. Not surprisingly, reliance on first principles leads the analysis to the proper conclusion. Interestingly, that conclusion appears to be a somewhat uncommon result under existing decisional law:[26] the most powerful way to ensure that a particular class of shareholders is dealt with fairly in the face of a structural conflict is to empower it with a fully-informed non-coerced vote that conditions the consummation of a transaction on its acquiescence.[27] Such a vote can surround a board's action with business judgment protection notwithstanding allegations that might otherwise rebut the business judgment rule's presumptions.

### A. The Business Judgment Rule

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business affairs of the corporation."[28] Acknowledging the managerial discretion that directors of a company are afforded pursuant to 8 Del. C. § 141(a), the business judgment rule is a presumption that in making a business decision, the board of directors "acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."[29] Under the business judgment rule, the burden of pleading and proof is on the party challenging the decision to allege facts to

23. *In re USACafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991).

24. *See Solomon v. Pathe Comm. Corp.*, Del Supr., 672 A.2d 35, 38 (1996).

25. It is worth noting that there is no significant dispute between the parties about the mechanics of the transaction, the chronology of events, or the persons involved.

26. One result reached herein, namely that shareholder ratification in the context of the alleged facts invokes the business judgment standard of review, does not differ in substance from the legal result reached by the Court in *In re Wheelabrator Technologies Inc. Shareholders Litig.*, Del. Ch., 663 A.2d 1194

(1995) (*"Wheelabrator II "*). The two cases are *very* different in terms of the alleged facts.

27. This statement is *not* intended to communicate that all corporate action that is required to be put to a shareholder vote, or that corporate actions submitted for shareholder approval as a voluntary matter by the board, *must* proceed on a class-by-class basis or even on a majority of the minority basis. *See Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1381–82 (1996).

28. *Aronson*, 473 A.2d at 811 (citing 8 Del. C. § 141(a)).

29. *Id.* at 812.

rebut the presumption.[30] Usually those facts include allegations that the board (in whole or in part) breached one or both of the duties of care and loyalty (and the subsidiary duties of disclosure and fair dealing). If the presumption is rebutted, the board's decision is reviewed through the lens of entire fairness, pursuant to which the directors lose the presumption of good business judgment, and where the Court more closely focuses on the details of the transaction and decision-making process in an effort to assess the fairness of the transaction's substantive terms.

## B. Heightened Scrutiny

There are situations where the Court subjects the disputed transaction to heightened scrutiny because of the inherent potential for self-dealing or entrenchment.[31] For instance, where a board of directors responds to a hostile threat to the corporation, its strategies, or its effectiveness, there is "the omnipresent specter that [the board of directors] may be acting primarily in its own interests, rather than those of the corporation and its shareholders."[32] Because the board of directors' fiduciary duties, which run to the corporation and its shareholders, potentially conflict with the directors' own self-interests, the board is not afforded the immediate presumption of propriety under the business judgment rule.[33]

It is important to note, however, that even in this so-called *Unocal* context where there is some lingering fear of entrenchment, that fear merely drives the Court to make an additional inquiry. Specifically, there is a heightened scrutiny of the defensive maneuvers. In that context, if a board can prove that its actions were justified, the business judgment rule remains in effect. Even if the board cannot justify its defensive actions, the lack of fairness to shareholders is not assumed—the board still has the opportunity to prove entire fairness.[34]

## C. Entire Fairness

Entire fairness review is a two-pronged inquiry into the fair process and fair price of the transaction. Generally, on a motion to dismiss, sufficiently plead allegations of lack of care or disloyalty will invoke entire fairness's strict scrutiny. More importantly, for the purposes of my analysis in this case, the structure of a transaction and the relationship between the parties might trigger stricter judicial scrutiny. In a situation where a parent company merges with a less-than-wholly-owned subsidiary, if allegations of self-dealing arise,[35] the transaction may not be

---

**30.** *See id.*

**31.** One might argue that in the analysis under *Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173 (1986), the Court engages in a different type of heightened scrutiny by focusing on the directors' duty to take care to achieve the highest and best price for shareholders in the context of a change of control. Any failure to take "extra" care in achieving the highest and best price can arise out of any combination of lack of due care or disloyalty on the directors' behalf.

**32.** *See Unocal Corp. v. Mesa Petroleum Corp.*, Del.Supr., 493 A.2d 946, 954 (1985); *Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361 (1995).

**33.** *See id.*

**34.** *See Ivanhoe Partners v. Newmont Mining Corp.*, Del. Ch., 533 A.2d 585 (1987) *aff'd*, Del.Supr., 535 A.2d 1334 (1987).

**35.** "Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary." *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971); *accord Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 n. 27 (1989). *But cf. Citron v. E.I. Du Point de Nemours & Co.*, Del. Ch., 584 A.2d 490, 500 n. 13 (1990) (citing conflicting cases and suggesting that the parent-subsidiary or controlling stockholder relationship *alone* can raise an inference of improper dealing during a transaction).

afforded the protections of the business judgment rule.[36]

■ Once plaintiffs have carried their burden of pleading, thus defeating the business judgment rule's presumptions, as the case moves forward the director defendants must prove that the disputed transaction is entirely fair.[37] The burden of proof, however, can be shifted to the plaintiffs to the extent that the board of directors can establish that it was able to construct a fair process. This showing can be achieved, for example, through the board's use of a well-functioning committee of independent directors.[38] Delaware courts have always recognized the fact that the burden of proving entire fairness is often a daunting task, but some boards have been able successfully to carry that burden.[39]

### D. Shareholder Ratification [40]

■ For some time Delaware law has recognized that the shareholder franchise can be employed as a powerful tool in fashioning a fair process. The power of fully informed shareholder ratification to cloak transactions in the business judgment rule, or to extinguish a breach of fiduciary duty claim entirely, is by no means absolute. Unfortunately for boards of directors, shareholders, litigants, and their attorneys, Delaware's law concerning the effect of shareholder ratification in the face of an alleged breach is not a model of clarity.

■ Under Delaware law, there are no less than four different legal effects that a fully informed shareholder vote can have,[41] each depending on five different circumstances.[42] In addition, to the extent that shareholders are provided with the opportunity to accept or reject certain board actions by a vote (*e.g.*, approve a merger), the Delaware Supreme Court has made it clear that ratification of one board action does *not* extend to any other actions which are not necessarily attendant to that ap-

---

**36.** *See Sinclair Oil*, 280 A.2d at 720–23; *Gabelli & Co. v. Liggett Group, Inc.*, Del. Ch., 444 A.2d 261, 264–67 (1982). Self-dealing claims may properly be seen as a subset of breach of loyalty claims. Self-dealing attacks on the business judgment rule require that there be something more than a simple transaction between a parent and its subsidiary, there must be some cognizable allegation of wrongdoing. *See Sinclair Oil*, 280 A.2d at 720.

**37.** *See Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983).

**38.** *See Kahn v. Tremont Corp.*, Del.Supr., 694 A.2d 422 (1997) (finding that the special committee established to negotiate the purchase of a block of stock did not function independently). Use of a special committee of directors as a *device to ensure fairness is not* the exclusive strategy a board can use, however. Where a fair process is the goal, *any* strategy that successfully protects minority interests will suffice.

**39.** *See Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1376 (1993) (stating that entire fairness review invokes a standard so exacting that it ordinarily, but not invariably, results in a finding of liability) (citing cases); *see also In re The Walt Disney Company Derivative Litig.*, Del. Ch., 731 A.2d 342, 367 (1998).

**40.** Shareholder ratification is a broad term of art "intended to describe any approval of challenged board action by a fully informed vote of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal existence." *Wheelabrator II*, 663 A.2d at 1201 n. 4 (1995); *see generally* Lawrence A. Hamermesh, *Calling Off the* Lynch *Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L.Rev. 1087 (1996).

**41.** Those effects are to either: 1) have no effect whatsoever; 2) fully extinguish a legal claim; 3) shift the burden of proof to the party opposing the act giving rise to the alleged breach; or 4) maintain the business judgment rule's presumptions.

**42.** Those circumstances include: 1) allegations of a void act; 2) allegations of breach of the duty of care in any context; 3) allegations of breach of duty of loyalty by directors or officers by engaging in self-interested transactions (*e.g.*, granting of stock options); 4) transactions with a *de facto* or *de jure* controlling stockholder (*e.g.*, parent-subsidiary mergers); 5) transactions outside the context of control persons or groups where shareholder approval is required or sought.

proved action.[43] The textured, though sometimes confusing, distinctions found in our law are a function of two details. The first is the distinction between void or voidable acts. The second, which is partly a subset of voidable acts, deals with the different fact patterns under which duty of loyalty claims arise.

### 1. Void Acts

■■■■ Void acts are those acts that the board, or more generally the corporation, has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy. As defined by decisional law, void acts are those acts that are not performed in the interest of the corporation,[44] irrespective of whether or not they are authorized by a corporation's certificate of incorporation. The list of void acts, while not exclusive, is nonetheless very restricted. Void acts include fraud, gift, waste, or *ultra vires* acts.[45] No amount of shareholder ratification validates acts repugnant to public policy (*e.g.,* fraud), and which are therefore void *ab initio.* In other words, those acts may still be subject to this Court's equitable powers (*e.g.,* rescission). Other than void

acts precluded by public policy concerns, fully informed shareholder ratification will insulate a board action from subsequent legal attack by shareholders. The restriction is that only a *unanimous* shareholder vote can ratify these remaining void acts.[46]

### 2. Voidable Acts

■■■■ On the list of voidable acts, *i.e.,* acts performed in the corporation's interest but beyond management's explicit authority, are other acts that may relate to breaches of fiduciary duty. Some of these land on the "voidable" rather than the "void" list by simple judicial fiat. For instance, for some time it has been held that in any context breaches of the duty of care are voidable rather than void and can be entirely extinguished by informed shareholder ratification.[47]

### 3. The Duty of Loyalty and Ratification

The legal effect of shareholder ratification, as it relates to alleged breaches of the duty of loyalty, may be one of the most tortured areas of Delaware law. A differ-

---

**43.** See In re Santa Fe Pacific Shareholder Litig., Del.Supr., 669 A.2d 59, 67–68 (1995).

**44.** See Michelson v. Duncan, Del.Supr., 407 A.2d 211, 218–19 (1979).

**45.** Generally, *ultra vires* acts can be defined broadly or narrowly. The broad definition refers to any act which is in excess of those powers explicitly authorized—even those acts not prohibited. See Black's Law Dictionary 1057 (abr. 6th ed.1991). In the context of defining void acts, *ultra vires* acts fall under a much more narrow definition which includes acts specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law. This distinction has been at least implicitly recognized by Delaware courts which have held that shareholder ratification can cleanse *voidable* acts undertaken without explicit or implicit board authority. See Michelson, 407 A.2d at 219–20 (1979) ("We hold that the Vice–Chancellor properly found the directors' action to be voidable to the extent attack on

the Plan was premised on lack of director authority and that after-the-fact shareholder ratification related back to cure such invalidity unless the ratification procedure proved to be lacking in fairness or procedurally defective.").

**46.** See Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 335 (Mar. 11, 1997) (REVISED) ("[I]t has long been held that shareholders may not ratify waste except by a unanimous vote. The idea behind this rule is apparently that a transaction that satisfies the high standard of waste constitutes a gift of corporate property and no one should be forced against their will to make a gift of their property.") (citation omitted). The unanimity restriction provides an easy justification for the profound legal effect of a unanimous shareholder vote. Of course, considering the sheer improbability of such a vote, this is largely a hypothetical discussion.

**47.** See Wheelabrator II, 663 A.2d at 1200; Smith v. Van Gorkom, Del.Supr., 488 A.2d 858, 889–90 (1985).

ent rule exists for every permutation of facts that fall under the broad umbrella of "duty of loyalty" claims.

The first type of loyalty claim is self-interest or, as it is more aptly put, self-dealing transactions. In a classic self-dealing transaction the corporation engages in any sort of contract or deal with an individual or group of officers and directors. Over the last century there has been a gradual shift in how the law has conceived of transactions between the corporation and its officers and directors and the type of recourse that shareholders have been entitled to in those instances.[48] In Delaware, those transactions are specifically covered by statute, 8 *Del. C.* § 144, the interested directors provision.[49]

Recently, in *In re Walt Disney Company* this Court had the opportunity to revisit the subject of shareholder ratification and full disclosure in the context of a § 144(a)(2) interested transaction claim.[50] In that context, the Court reaffirmed the settled proposition that shareholder ratification by a majority of the disinterested shareholders acts as a safe harbor in situations where directors' potentially conflicting self-interests are at issue.[51] Thus, in a classic self-dealing transaction the effect of a fully-informed shareholder vote in favor of that particular transaction is to maintain the business judgment rule's presumptions. To rebut those presumptions at the motion to dismiss stage the plaintiff must "allege facts showing that no person of

**48.** *See* Harold Marsh, Jr., *Are Directors Trustees? Conflict of Interest and Corporate Morality*, 22 Bus. Law. 35, 36–43 (1966) (chronicling corporate case law from the 1880's–1960's and concluding that: 1) in 1880 the law regarded any transaction between the corporation and the insider as automatically voidable at any shareholder's request; 2) by 1910 any transaction that was approved by a disinterested majority of directors was not automatically void, but where a majority of the directors were interested in the transaction it was automatically voidable at any shareholder's request; and 3) by the 1960's no transaction was automatically voidable, whether or not voted on by disinterested directors, but courts would subject such transactions to entire fairness review). *But cf.* Norwood Beveridge, *The Corporate Director's Fiduciary Duty of Loyalty: Understanding the Self–Interested Director Transaction*, 41 DePaul L.Rev. 655 (1992) (asserting that Marsh's conclusions about early self-interested transactions was closer to the current state of the law, and citing certain cases and treatises in support of his claim). Commentators applaud Beveridge's research on the subject to the extent that it highlights contradictions in the prevailing law of the time but ultimately conclude that Marsh's characterization is most likely still viable. *See, e.g.*, William L. Cary & Melvin Aron Eisenberg, *Corporations: Cases and Materials* 650–51 (7th ed.1995).

**49.** *See* 8 *Del. C.* § 144(a)(2), which reads in part:

[No contract or transaction between the corporation and ... directors or officers ... shall be void or voidable ...if: ](2) The

material facts as to his relationship or interest and as to the contract or transaction are disclosed or know to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders.

By its own terms § 144 removes acts or transactions that have been properly ratified by shareholders from the definition of void or voidable acts. It is important to note that, as a matter of law, self-dealing transactions are not automatically voidable if they are not approved by disinterested directors or ratified by fully informed shareholders. The interested parties to the transaction may still be able to demonstrate that the transaction was entirely fair to the corporation and therefore valid. Thus, when interested parties submit a transaction for approval by disinterested directors (under § 144(a)(1)), or a board submits a potentially self-interested transaction for shareholder approval (under § 144(a)(2)), that submission is essentially a "voluntary addition of an independent layer of shareholder approval in circumstances where such approval is not legally required." *Wheelabrator II*, 663 A.2d at 1201 n. 4 (1995) (citing examples).

**50.** *In re The Walt Disney Co. Derivative Litig.*, Del. Ch., 731 A.2d 342, 368 (1998).

**51.** *See id; accord Marciano v. Nakash*, Del. Supr., 535 A.2d 400, 405 n. 3 (1987) (shareholder ratification pursuant to § 144(a)(2) invokes "the business judgment rule and limits judicial review to issues of gift[, fraud, *ultra vires*,] or waste with the burden of proof upon the party attacking the transaction.").

ordinary sound business judgment could view the benefits received as a fair exchange for the consideration paid by the corporation," *i.e.*, that the transaction was irrational or amounted to waste.[52]

■■■■■ The second scenario which often gives rise to duty of loyalty allegations that can be affected by shareholder ratification involves transactions between a corporation and its controlling stockholder (*e.g.*, a parent-subsidiary merger)[53] or fundamental changes of corporate policy sponsored by a controlling shareholder (*e.g.*, charter amendments).[54] Generally, in a parent-subsidiary merger where the parent controls the subsidiary, and can thereby "force" the merger, the standard of review is entire fairness and the burden of proof is on the sponsoring directors.[55]

■■■■■ The Delaware Supreme Court, in *Kahn v. Lynch*,[56] explicitly recognized that an informed ratification by a majority of minority shareholders of a transaction between a controlling shareholder and a corporation has the effect of shifting the burden of proof on the issue of entire fairness from the controlling shareholder to the challenging shareholder.[57] At one point it was unclear whether, generally speaking, proper shareholder ratification could have an extinguishing effect on a challenging shareholder's claim or simply shift the burden of proof of entire fairness from the controlling shareholder to the challenging shareholder.[58] Present decisional law, however, would not support the proposition that, in the context of a controlling shareholder, a duty of loyalty claim is extinguished after a showing of fully informed shareholder consent.[59]

52. *Disney*, at 362–64.

53. Under Delaware law, the notion of a "controlling" stockholder includes both *de jure* control and *de facto* control. *See, e.g., Kahn v. Lynch*, Del.Supr., 638 A.2d 1110 (1994) (a cash-out merger between a corporation and its *de facto* controlling shareholder); *accord Wheelabrator II*, 663 A.2d at 1203 (1995).

54. *See, e.g., Stroud v. Grace*, Del.Supr., 606 A.2d 75, 83–84 (1992) (where plaintiff contested the fairness of amendments to the certificate of incorporation which were proposed by controlling-shareholder directors).

55. *See Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983). Without specialized voting restrictions (*e.g.*, class voting or majority of the minority approval), entire fairness review is unaffected by shareholder ratification. The theory is that since the controlling shareholder can force through the proposed action/transaction by virtue of his control over the franchise, shareholder ratification is self-serving and unremarkable.

56. Del.Supr., 638 A.2d 1110, 1117 (1994).

57. *See also Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 937 (1985); *Citron v. E.I. Du Point de Nemours & Co.*, Del. Ch., 584 A.2d 490, 502 (1990).

58. *Compare Schlossberg v. First Artist Prod. Co.*, Del. Ch., C .A. No. 6670, at 19, 1986 WL 15143, Berger, V.C. (Dec. 17, 1986) ("[T]he fully informed vote of the minority stockholders provides an independent basis for a sum-

mary judgment in favor of defendants.") *with Braunschweiger v. American Home Shield Corp.*, Del. Ch., C.A. No. 10755, 1991 WL 3920, Allen, C. (Jan. 7, 1991) (suggesting that shareholder ratification could either "constitute[ ] a defense to plaintiffs' claim of breach of fiduciary duty, or merely shift[ ] the burden to plaintiffs to prove the unfairness of the transaction").

In any event, the party offering the defense of shareholder ratification bears the burden of proof of showing that the disclosure was legally sufficient. *See Citron*, 584 A.2d at 502. ("The parties who assert the defense of shareholder ratification have the burden to establish that they fully disclosed all material facts in their proxy disclosures."); *see also Yiannatsis v. Stephanis*, Del.Supr., 653 A.2d 275, 280 (1995).

59. *See In re Santa Fe Pacific Shareholder Litig.*, Del.Supr., 669 A.2d 59 (1995) (holding that majority approval after full disclosure of a merger did not extinguish shareholders' claims against railroad corporation and its board of directors for purposes of shareholders' action challenging the merger and defensive measures taken by the board in light of a hostile bidder's efforts to acquire the railroad corporation); *see also Williams v. Geier*, Del. Supr., 671 A.2d 1368 (1996) (noting that a seemingly valid stockholder vote may be invalidated by showing that shareholders were wrongfully coerced by the structure or circumstances surrounding the transaction; wrongful coercion exists where shareholders are led to vote in favor of the transaction for some reason other than its merits).

Thus, in the context of a duty of loyalty claim where plaintiff minority shareholders can state a claim of self-dealing at their expense, an *informed shareholder ratification* by the minority shifts the burden of proof of entire fairness to the plaintiff.

■■■■■ A third fact pattern exists where breach of duty of loyalty allegations are made (but not often successfully) and where shareholder ratification can have a penetrating legal effect. These are situations where shareholder approval is sought (*e.g.*, approval of a merger) [60] and where there is *no* controlling shareholder, control group, or dominating force [61] that can compel a particular result. Absent any other allegations that might cast doubt on the board's disinterest vis-à-vis the merits of the transaction, an informed and un-coerced shareholder vote on the matter provides an independent reason to maintain business judgment protection for the board's acts.

## IV. APPLICATION OF THE LAW

### A. GM's Actions and the Business Judgment Rule

In the present case, the threshold issue is whether plaintiffs have alleged facts to rebut application of the business judgment rule. It is undisputed that eleven of the thirteen GM directors who approved and recommended the split-off are non-employ-

ee, non-management directors ("outside directors"). Plaintiffs do not allege that any of the outside directors are dominated or otherwise beholden to any individual financially interested in the split-off. Nor do plaintiffs allege facts to demonstrate that the board failed to consider the split-off with due care. Plaintiffs' primary attack on the good faith of the outside directors is that because most, if not all, of the outside directors held a disproportionate number of shares of GM 1-2/3 common stock, they had a *personal* financial interest in the split-off and therefore could not consider the terms of the split-off impartially.

Defendants have two responses. First, they argue that directors routinely "make difficult decisions involving competing interests of various shareholder groups." [62] Defendants explain that Delaware courts consistently apply the business judgment rule to protect directors' business judgment, *even* when the directors making the decision have financial interests as shareholders that are opposed to the interests of one or more groups of other shareholders. Second, defendants argue that it is not enough for plaintiffs to plead that the outside directors held a disproportionate number of shares of GM 1-2/3 common stock. They insist that plaintiffs must also plead that the GM director defendants held these shares in amounts that were *material* to them.

---

The Delaware Supreme Court has not squarely addressed the issue of whether fully-informed shareholder ratification may legally bar *approving* shareholders from subsequently asserting duty of loyalty claims. *See id.* at 1379 n. 23. *But see Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 848 (1987) ("When an informed minority shareholder either votes in favor [of a transaction or] ... accepts the benefits of the transaction, he or she cannot thereafter attack its fairness.").

**60.** *See, e.g., Wheelabrator II*, 663 A.2d at 1205 n. 8 (1995) (holding that the business judgment standard of review applied in the case where plaintiffs challenged board approval of a merger on loyalty grounds; where the acquiring corporation only held 22% of the target's stock; where the court found lack of evidence that the acquiring corporation exer-

cised *de jure* or *de facto* control: and where the merger was approved by a fully informed vote of disinterested directors which has "the same procedural effect as a ratifying disinterested shareholder vote").

**61.** In order for a plaintiff to successfully allege domination in the absence of controlling stock ownership, a plaintiff must allege literal control of corporate conduct. *See Kaplan v. Centex Corp.*, Del. Ch., 284 A.2d 119, 122–23 (1971); *accord In re Sea–Land Corp. Shareholders Litig.*, Del. Ch., C.A. No. 8453, at 6–8, 1988 WL 49126, Jacobs, V.C. (May 13, 1988).

**62.** *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1148 (1990); *Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d 584, 595 (1986).

 I am persuaded by defendants' arguments on both grounds. Directors must often resolve conflicts among classes of stock, and the fact that a majority of the directors own more of one class than another does not necessarily implicate the directors' good faith or loyalty.[63] In addition, it is well established that when a party challenges a director's action based on a claim of the director's debilitating pecuniary self-interest, that party must allege that the director's interest is material to that director.[64] This simple statement of the law was pointed out by defendants during oral argument (and in their briefs), yet plaintiffs persist in failing to allege materiality or even to meet the argument. Consequently, these allegations fail to rebut the business judgment standard of review.

Plaintiffs also allege certain other collateral attacks on the board's loyalty claiming that various factors detrimentally affected the process the board set for negotiation of the substantive terms. In other words, plaintiffs claim that the board loaded the process against the Class E stockholders. For instance, plaintiffs allege that at one point during the split-off negotiations GM began to pressure the EDS team with unrelated threats, including · withholding certain disputed payments under pre-existing contracts and withholding consideration of post-merger anti-takeover provisions until after negotiations progressed.

 There is no allegation, however, that the contract disputes were explicitly linked to preferential terms for the split-off. Nor do plaintiffs allege that the amounts in dispute were material such that non-payment might have been perceived as an implicit threat. Furthermore, there is no basis for an inference that the GM board's delay in considering post-merger anti-takeover provisions had the intent, actual effect, or even the potential of strong-arming the EDS team into settling on better terms for GM's continuing shareholders. As mentioned earlier, the board did not object to the measures at the time they were presented by EDS officers, and it actually ended up adopting them. These allegations do not provide a basis for a reasonable inference that the GM team coerced the EDS team to accede to better terms. Thus, these allegations fail to rebut business judgment review.

Plaintiffs further attack the process by focusing the Court's attention on the following alleged facts: The two investment banks that advised the EDS team-Morgan Stanley and Lehman Brothers-were arguably beholden to GM considering that GM paid their fees. According to plaintiffs, the investment banks were chosen and appointed by GM, not the EDS team, and, further, the investment banks would earn $6.5 million of their $7.5 million fee only upon the consummation of the split-off. Additionally, plaintiffs aver that the investment banks had performed substantial ser-

**63.** Former Chancellor Allen's thoughts are instructive:

"It is easy to say that a director's duty runs to the corporation and all of its shareholders, but such a statement gives faint guidance to a director when conflicts among shareholder constituencies arise, as they do. For example, when merger considerations must be apportioned between Class A and Class B stock directors are inevitably faced with a conflict among classes of stock and, in most such instances, such directors will themselves own more of one class than another. Does such fact alone deprive such directors of the presumptions ordinarily accorded to their good faith decisions and require them to establish the intrinsic fair-

ness of the apportionment? And, if so, do different directors have different burdens depending upon which class of stock they happen to own more of. [sic] It is not my impression that this is the law."
*Freedman v. Restaurant Assoc. Industries, Inc.,* Del. Ch., C.A. No. 9212, at 27–28, 1987 WL 14323, Allen, C. (Oct. 16, 1987) (Mem.Op.) (citing *MacFarlane v. North American Cement Corp.,* Del. Ch., 157 A. 396 (1928)); *accord Gilbert,* 575 A.2d at 1147 ("In attempting to fulfill their fiduciary duties to the shareholders, directors may have to make difficult decisions involving the competing interests of various shareholder groups.").

**64.** *See Cede & Co. v. Technicolor, Inc.,* Del. Supr., 634 A.2d 345, 362–64 (1993).

vices for both GM and EDS in the preceding two years, for which they received compensation in the total amount of approximately $27.4 million.[65]

■ The short response to plaintiffs' allegations are that, by themselves, they do not rise to a level which causes the Court concern with the banks' or the board's ability to represent the Class E stockholders' interests faithfully throughout the process. The payment structure and relationship histories do not form a sufficient basis for the inference that these investment banks were willing to opine, or lean toward, better terms for GM during the negotiation of the transaction. The GM board independently decided that the split-off was in the best interest of the corporation—the advisors were simply employed to aid the directors (at least indirectly through the use of the negotiating teams) in obtaining all reasonably available information and to better estimate the value attributable to each of the GM operations. There are no allegations—beside the payment structures and histories—that the financial advisors erred in their underlying analyses or mislead the board or its agents as to the financials. No basis exists for *assuming* wrongdoing on the banks' part (and by implication the board's part) without allegations of an actual manifestation of bias in favor of GM through the investment banks' manipulation of financial information.

Plaintiffs try to attack implicitly the board's loyalty by assailing the loyalty of the EDS negotiating team to the Class E stockholders. Plaintiffs claim that since some members of the EDS team had an interest in assuring their continued employment by EDS following the split-off they were somehow prone to holding the continuing GM shareholders' interests above the Class E stockholders' interests. Plaintiffs also suggest that the reason these individuals wanted EDS to be split off was so that they could operate independently of GM management to control the newly split-off corporation and set their own compensation.

Assuming that plaintiffs are correct that the EDS team's motivations were to gain independence and greater influence over their compensation,[66] it still does not follow that they would subordinate Class E stockholders' interests. First, nothing in the complaint suggests that the EDS team had anything to do with the decision to commence the split-off in the first place.[67] Second, the EDS team only entered the picture at the point where the details of the substantive terms were negotiated. If the EDS team members were indeed consumed by self-interest, as plaintiffs allege, the only reasonable inference is that they would do whatever they could to ensure that the company they were soon to inherit had as many assets and resources as possible. Simply put, plaintiffs' contention runs contrary to reason. Finally, plaintiffs forget to point out that all of the terms of the post-split-off incentive plan for EDS management and employees were fully disclosed in the Consent Solicitation. More importantly, plaintiffs seem to forget that

65. *See supra* note 6.

66. This is a generous assumption, I think, considering that it is unrealistic to imagine that the EDS team could hijack the entire EDS governance structure for its own benefit following the split-off.

67. According to the Consent Solicitation, as late as June 1995 GM had not yet made any decision to split off EDS. By July 1995, GM's financial staff recommended the split-off to GM's senior management decision-making body. In August of that year, the GM board and the Capital Stock Committee undertook consideration and initial planning for the consummation of the transaction. While EDS executives were consulted in the formation of an initial GM strategic analysis, the ultimate decision to move forward with the transaction came at the behest of GM. There is no mention in the Consent Solicitation that the EDS board of directors or EDS management ever came to the independent conclusion, either when the transaction was first contemplated or when negotiating teams were formed, that a split-off was or was not in the best interest of EDS. *See* Consent Solicitation at 34–35.

Class E stockholders (along with all other classes) specifically approved of the amended EDS incentive plan apart from the split-off transaction. Thus, most—if not all—of plaintiffs' fears were specifically addressed by a fully-informed shareholder vote.

Based on the foregoing analysis, plaintiffs have not rebutted the presumptions of good faith and loyalty. Thus, the business judgment rule is still in effect. The analysis, however, does not end here.

### B. Transaction Structure Challenge to the Business Judgment Rule

As I mentioned earlier, this case is unusual in that it deals with the split-off of a tracking stock. Plaintiffs' final (and not entirely coherent) allegation of breach of loyalty is that the board had irreconcilably conflicting duties to the various shareholder classes by virtue of the corporation's capital structure. Thus, more than anything else, this case is about what the appropriate process should be when a board must allocate value between different shareholder classes.[68]

Putting aside the broad legal proposition that allocation of value between and among classes of shareholders is generally considered a business judgment, the issue of refining what the appropriate process should mean in the context of a tracking stock split-off hinges in part on how the Court conceptualizes the Class E stockholders' position. The defendants would have me view the Class E stockholders solely as stockholders in GM with no special consideration for the fact that Class E stock was dependant on EDS performance for its value, and not on the performance of all, most, or any of GM's other operations.[69] On the other hand, plaintiffs would have me consider the Class E stock-holders as akin to minority shareholders of a less-than-wholly-owned subsidiary who are essentially being frozen out of their continuing interest in the corporation. While I have some misgivings, defendants' position has substantial appeal considering that: 1) the Class E stock was in fact a GM stock; and 2) EDS was held as a wholly-owned subsidiary of GM. My reasons follow.

#### 1. A Freeze–Out By Any Other Name?

In this case, Class E stockholders were shareholders of the GM corporation. After the consummation of the transaction their collective interest in GM ended. Those details are about as close as plaintiffs get to the freeze-out analogy under the alleged facts of this case. The pivotal factor that distinguishes plaintiffs from minority shareholders in a less-than-wholly-owned subsidiary who are "frozen out" of their continuing interest in a corporation is that in a classic freeze-out the minority shareholders have no choice. That is, by virtue of its majority control, the parent corporation can force the transaction through without the consent of the minority and thus our law imposes heightened fiduciary duties on the parent corporation.[70]

Our cases have posited that at least one of the reasons for the imposition of heightened duties in a parent-subsidiary or a controlling-shareholder merger is the potential for coercion. The theory is that minority shareholders may vote in favor of a transaction notwithstanding their actual belief that they deserve a better deal for fear of retaliation of some kind. "For example, the controlling stockholder might decide to stop dividend payments or to

---

**68.** *See* Pls.' Answering Br. Opp'n Defs.' Mot. Dismiss at 46 ("Pls.' Ans. Br.").

**69.** I assume that plaintiffs would have me make this comparison while at least acknowledging that in the present case the shareholders were frozen out of the parent rather than the subsidiary, and the consideration received was an equity interest in the continuing operations of EDS, rather than cash received in a classic freeze-out merger.

**70.** *See Shell Petroleum, Inc. v. Smith,* Del. Supr., 606 A.2d 112, 113 (1992)

effect a ... merger at a less favorable price, for which the remedy would be time consuming and costly litigation." [71] There is no basis to justify such fears in the present case, however. Simply put, the GM board did *not* have the power to unilaterally effectuate a freeze-out merger on its own terms. Nor was the board in a position to retaliate against the Class E stockholders if they rejected the proposed transaction.

### 2. *Class Voting*

GM's certificate of incorporation provided that generally, on matters submitted to a shareholder vote, Class E stockholders were entitled to one eighth of a vote per share (while GM 1–2/3 stockholders received one vote per share and Class H stockholders received one-half of a vote per share).[72] All three classes of stock voted as a single unit on all matters. The certificate of incorporation, however, provided that each class vote separately as a class to approve certain amendments to the certificate. In particular, the certificate required independent class approval on any amendment which adversely affects that class's rights, powers, or privileges as embodied in the certificate.[73] Indeed, the transaction at issue in this case was conditioned on separate class voting for approval. Thus, Class E stockholders effectively held a veto power as a class if they did not approve of the terms of the proposed split-off or any subsequent alternative transaction. More than any other factor, this

detail—by itself—sufficiently distinguishes the present case from a classic freeze-out merger. But there are more.

### 3. *Dividend Policy Protections*

While GM's certificate of incorporation did not mandate the issuance of dividends to any class in any specific amount, there were certain limitations on the board's discretion to set dividend policies. The relevant terms of the certificate, which essentially amounted to contractual restraints, protected against retaliatory dividend policies against a hypothetical dissenting class.

In chief, the certificate restricted the board's power to declare and pay dividends on any one of the three classes of common stock to certain preformulated amounts that were attributed to each separate class of common stock and based on GM's legally available retained earnings. Thus, while the board had the discretion not to pay dividends at all, to the extent that dividends were paid to any one class, the certificate's restrictions served to preserve each class's interest in retained earnings relative to the other two classes.[74]

Stated simply, the certificate of incorporation anticipated such problems and took steps to make at least sure that the various classes had a formulaic way of maintaining relative equity. It would be fantastic to imagine that Class E stockholders would be in any way coerced or even fearful of the potential that GM's board (overwhelmingly comprised of outside indepen-

---

71. *Citron v. E.I. Du Point de Nemours & Co.*, Del. Ch., 584 A.2d 490, 502 (1990).

72. *See* Consent Solicitation at 132. While the parties only make brief specific mention of GM's certificate of incorporation and its substantive provisions, it is well settled that where certain facts are not specifically alleged (or in dispute) a Court may take judicial notice of facts publicly available in filings with the SEC. *See In re Santa Fe Pacific Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69–70 (1995); *Mentor Graphics Corp. v. Quickturn Design Sys ., Inc.*, 728 A.2d 25, 49 n. 95 (1998), *aff'd on other grounds, Quickturn Design Sys., Inc. v. Mentor Graphics Corp.*, Del.

Supr., 721 A.2d 1281(1998). In addition, documents incorporated by reference into the complaint (*e.g.*, the Consent Solicitation) may also be properly considered on a 12(b)(6) motion to dismiss. *See Santa Fe*, 669 A.2d at 69; *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Del. Ch., C.A. No. 13911, at 1 n. 2, 1995 WL 662685, Jacobs, V.C. (Nov. 2, 1995); *Lewis v. Straetz*, Del. Ch., C.A. No. 7859, at 6–10, 1986 WL 2252, Hartnett, V.C. (Feb. 12, 1986).

73. *See* Consent Solicitation at 132.

74. *See id.* at 133.

dent directors) would take the chance of alienating each and every class of stock by restricting all dividends just to punish dissenting Class E shareholders.

 Another theoretical potential for abuse is that the board ·could continue to declare and pay dividends to the other classes according to relative share (as set by the pre-determined formulas) but keep the Class E stockholders' share in retained earnings, i.e., delay or deny future dividend distributions only to ·Class E stockholders but keep the cash in the coffers. The Court declines to entertain such transparent hypothetical abuses and the hypothetical fear of retribution and coercion they might induce where no cognizable basis exists for even an inference of lack of due loyalty, lack of due care, or bad faith on behalf of the GM board. In addition, the certificate provided another independent layer of oversight other than the discretion of the full board: As explained in further detail below, the certificate provided that the Capital Stock Committee oversee dividend policy, and where appropriate, recommend changes.

#### 4. *Capital Stock Committee*

One *might* think that the board could surreptitiously penalize Class E stockholders' dividends (or other distributions) by manipulating inter-company transactions. In other words, by steering business from the Hughes or GM operations away from EDS, the GM board could theoretically limit the variables in the distribution formulas that set the relative amount Class E stockholders' are entitled to receive. Thus, Class E stockholders *may* have a *theoretically* justifiable fear of retribution in that the GM board could artificially depress EDS's earnings and consequently the Class E stockholders' relative claim on the corporation's retained earnings.

This back-office doomsday scenario, however, is simply unlikely and, more to the point, it was precisely this type of end-run that was anticipated by GM's certificate of incorporation. Under the certificate the full board of directors maintained a standing Capital Stock Committee,[75] comprised entirely of independent directors of GM. The Capital Stock Committee's role, as defined by GM's by-laws,[76] was to oversee all matters affected by potential divergences of interests between any of the three classes including, among other things, all inter-company transactions and dividend policies. While the Capital Stock Committee did not have the power to set policy (*i.e.*, to unilaterally implement corporate actions), it did have responsibility for structuring fair processes and dealings among the various competing interests. Thus, it provided an entirely independent review of the full board's policies and had the primary responsibility for recommending solutions to resolve conflicts.

Nothing in the complaint gives rise to a reasonable inference that this committee failed to operate independently, failed to execute its role with due care, or failed to execute its oversight and conflict resolution functions in good faith. It is unclear why the system created in GM's certificate of incorporation should be prone to a presumption of lack of business judgment. I see no reason in the pleadings why any fear of potential coercion or retribution against dissenting Class E stockholders should ensue. Although not central to my holding in this case, presumably GM's dispute resolution mechanism was agreed to by Class E stockholders when they first became part of the GM corporation. It is unclear to me why a court should be unsatisfied by a process that was, in all likelihood, bargained for by shareholders themselves.

#### 5. *"Forced Merger" Potential*

Finally, the last potential basis for fear of coercion is a "forced" transaction where-

---

**75.** This is the very same committee that allegedly shepherded the contested split-off transaction.

**76.** *See* Consent Solicitation at 133.

by the Class E stockholders might be squeezed out by an inequitable deal in retribution for rejecting the split-off transaction on the terms initially proposed. The short answer to this hypothetical threat is that it simply could not happen. In addition to requiring class-by-class approval, the certificate of incorporation prevents such an occurrence by providing the Class E stockholders with the protection of the Exchange Rate—which provided for an automatic twenty percent premium over the value of Class E stock prior to the transaction to be paid in the form of shares of GM 1–2/3 stock upon the occurrence of a triggering event.[77] A unilateral conversion of Class E stock in exchange for GM 1–2/3 stock by the GM board, or any transaction that would amount to a recapitalization, sale, change of control, *etc.*, would automatically trigger the Exchange Rate. Thus, without first seeking the Class E stockholders' authorization to modify the terms or altogether delete the Exchange Rate, there is no way the board could set the terms of any deal that could freeze out Class E stockholders without their consent. In fact, according to the alleged facts, such modification of the Exchange Rate was exactly what occurred in the contested split-off.

▮ In sum, both the form and the substance of the transaction in this case is radically different from a parent-subsidiary freeze-out merger or any other transaction with a controlling shareholder.[78] The certificate of incorporation protected shareholders' interests in the form of contractual limitations on the board's power—primarily through the combination of veto power and the Exchange Rate. The Capital Stock Committee provided independent oversight for the resolution of conflicting

interests. And, the wider backdrop created by the case law indicates that value allocation decisions by boards are generally protected by the business judgment rule.[79] Together, these circumstances compel me to reject the notion that the Court should conceptualize the split-off transaction as akin to a minority freeze-out. That conceptualization could too easily deprive the board of business judgment protection in a situation where the business judgment rule's presumptions seem appropriate.

## C. The Effect of the Wholly–Owned Subsidiary Form

As their marquee legal argument, defendants point to the proposition that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interest of the parent and its shareholders."[80] I take defendants' reference to mean that here, if GM's board acted in a way that reasonably aimed to maximize shareholders' interests, then the business judgment rule should apply irrespective of the precise effects on the EDS operations. While this is a correct statement of law, defendants' mere recitation says nothing about its application to this case. That principle contemplates on its own terms that the best interests of *all* of the shareholders of the parent company will be considered by the Board.

▮ There are two legally relevant questions that guide the Court's analysis as to whether the board acted in all of the various classes' best interests. First, was the process for allocating value reasonably aimed at providing a fair result to all shareholders taken together and each and

---

**77.** *Id.*

**78.** *Cf. Lewis v. Great Western Corp.*, Del. Ch., C.A. No. 5397, 1977 WL 2574, Brown, V.C. (Sept. 15, 1977) (recapitalization, benefiting controlling shareholders who could have forced the transaction, reviewed under entire fairness standard).

**79.** *See supra* notes 62–63 and accompanying text.

**80.** *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, Del.Supr., 545 A.2d 1171, 1174 (1988).

every class of shareholders taken separately? Second, even to the extent that aspects of the process may have been flawed, were all shareholders sufficiently informed about the details of the process and empowered to make an independent decision on the substantive terms of the transaction? [81] If *either* question is answered in the affirmative the business judgment rule's presumptions must remain in effect, and in order to successfully challenge the transaction plaintiffs must allege facts that amount to a claim of waste.

### 1. *The Reasonableness of The Process*

 To the extent that in a given transaction different shareholder classes have mutually exclusive interests, the ability of the board to act in all of the shareholders' best interests is seriously complicated. From a corporate governance perspective, it is precisely this danger that is endemic to companies with complex capital structures. Even if Delaware courts recognize that boards of directors routinely and properly have to make decisions that benefit one class of stock at the expense of another,[82] where boards choose (or certificates require) a formal procedure to resolve conflicts due to diverging shareholder interests, the process by which those decisions are ultimately made must not fundamentally, without warning, disadvantage one class of stock.

 At the same time, where a board's task is to allocate value between two classes of stock, I do not think that it

is Delaware law that the board has to set up an exacting process that actually replicates an arm's-length transaction between shareholders. As a matter of common practice a literal arm's-length negotiation happens when a soon-to-be-subsidiary tracking stock company is first merged into another company (*e.g.*, when EDS first became part of the GM corporation).[83] During that process negotiators for the prospective subsidiary can anticipate future conflicts of interest and draft appropriate provisions to deal with them under the certificate of incorporation. This is clearly a more efficient method of coping with potential divergences of interest between shareholder groups than having courts adapt procedural mechanisms (*e.g.*, special committees, burden shifts, *etc.*) that are unnecessary or poorly adapted to new contexts. Where, as here, the pre-split-off certificate of incorporation provides for powerful procedural protections for all classes of stock, I think that it is inappropriate for a court to impose unhelpful requirements in the name of common law fiduciary duties.

 Once a court decides whether or not the provisions of the certificate of incorporation should control, there is the separate issue of whether or not the processes described therein actually operated as intended. At the present motion to dismiss stage, my task is simply to determine whether it is reasonably certain that the plaintiff could not prevail under any set of facts that can be inferred from the complaint. Thus, the question is whether plaintiffs have alleged facts from which it might be inferred that the directors or

**81.** The board retained explicit authority to pass judgment over and approve the substantive terms of the transaction. According to plaintiffs, the Capital Stock Committee and the negotiating teams were not independently empowered to make any binding corporate decision. Thus, I do not think that this is a case where the board set up a process that assumed refined fiduciary duties and by virtue of that assumption bound the board to replicate an exacting arm's-length negotiation between the parties. *Cf. Cencom Cable Income*

*Partners, L.P., Litig.*, Del. Ch., C.A. No. 14634, 1997 WL 666970, Steele, V.C. (Oct. 15, 1997).

**82.** *See supra* note 63.

**83.** Tracking stocks can be created in a plethora of other circumstances, none of which do I pass judgment on here. For instance, I do not express any opinion on the situation where a certificate of incorporation contains no (or insufficient) provisions for dealing with shareholders' conflicting interests.

their agents did not follow the certificate's provisions: 1) in good faith; 2) employing a rational (*i.e.*, non-arbitrary) basis for making the allocation; 3) on a reasonably informed basis (*i.e.*, with due care); or 4) in the shareholders' interests, as opposed to the directors' or anyone else's personal profit or betterment, (*i.e.*, that they acted with due loyalty). If no basis exists for such an inference, then the business judgment rule should protect the board's allocation determination. I conclude that plaintiffs have failed to make the necessary showing.

For obvious reasons it made sense for the Class E stockholders to receive stock in an independent EDS as consideration for this transaction.[84] Since the Class E shares were tied to EDS performance, stock in an independent EDS would arguably be the most fair consideration for which the Class E stockholders could hope. On one level of analysis, they ended up with that which they started: Before the split-off, the value of their holdings was dependent on EDS performance, and after the split-off the value of their holdings continued to depend on EDS performance. This, of course, only holds if the interest in EDS that the Class E stockholders started with was equivalent in value to the EDS shares they received after the split-off.[85]

The GM board evidently realized that the process of creating two separate companies would require a negotiation of precisely who owned what, which corporation should maintain control over which business decisions, and to what extent was a wealth transfer necessary in order to ensure that each corporation received value in exchange for rights that it had previously enjoyed. By creating the negotiating teams, the board—through the Capital Stock Committee—attempted to resolve these issues by trying to approximate an arm's-length transaction.[86] In most respects, the GM board and the Capital Stock Committee went about this task in the right way: 1) the negotiations persisted for quite some time; 2) the two teams seemed to come close to impasse before the GM board stepped in; 3) all of the relevant groups retained highly reputable legal counsel; and 4) disclosure of the events surrounding the transaction appears to have been thorough. While there are a few details that give me reason to pause, they ultimately do not compromise the application of the business judgment rule.

As mentioned above, between August and November 1995 the two teams engaged in negotiations but could not come to common ground on the substantive terms of the transaction. According to the Consent Solicitation, the Committee (again with GM board approval) gave the teams four points to act as guidelines regarding the goals and priorities of the split-off, including,

> (i) an appropriate, long-term IT supply contract should be developed for the proposed split-off to achieve the respective business goals of GM and EDS; (ii) the terms of any such contract should take into account and further the legitimate interests and expectations of all GM stockholders; (iii) GM should re-

---

84. Theoretically, the goal of separating EDS from GM could have been achieved by a number of methods. For instance, GM could have spun off the subsidiary to all classes of the shareholders and given the EDS shareholders some appropriately valued continuing interest in the parent company. To the extent that this hypothetical transaction would have triggered the 120 percent recapitalization right attendant to the Class E shares, the board could have solicited consent of the Class E stockholders to modify that right just as it did in the present case.

85. By stating the issue in this manner, however, I do not mean to suggest that parity of value is the appropriate legal question at this point. As the following discussion explains, for present purposes it is the process by which that question was decided that is the relevant legal focus.

86. *See* Consent Solicitation at 36.

sume the principal role in developing and supervising its IT strategy and programs, while still drawing on EDS's expertise; and (iv) since following any split-off the Capital Stock Committee would no longer be able to review the terms on which EDS provides IT services to GM and would therefore have to rely on contractual protections, the IT Services Agreements should provide GM with greater ability to test the competitiveness of the terms on which EDS would provide such services to GM, including through the opportunity to competitively bid limited portions of GM's IT service needs and to award such bids to suppliers other than EDS when appropriate.[87]

Arguably the first two directives do no operate against EDS's or the Class E stockholders' interests. The third and the fourth directives, on the other hand, are clearly statements that push the negotiating teams towards discussions aimed at furthering GM's, and not EDS's, corporate policies. The communication of these guidelines, while not conclusive, is a reasonable basis for an inference of lack of arm's-length negotiations. In the context of unrelated party arm's-length negotiations, there is simply no entity with overriding authority to dictate terms that benefit one side over the other.

But these were not the only items on the negotiation table between the two teams. At this point, the two most substantive issues—the adjusted terms of the MSA and the amount of the inter-company transfer—were not yet settled. So while the GM board may have dictated certain items, to the extent that those terms represented a transfer of value from EDS to GM, the effects of that transfer could be balanced by the remaining issues. In addition, there is no indication that in dictating these terms the board acted in bad faith, arbitrarily, carelessly, or selfishly.

Plaintiffs contend that in dictating these terms the GM board was motivated by an improper personal self-interest in that the directors sought to procure better terms for continuing GM shareholders because they would continue to serve those shareholders after the transaction. I view this as a type of entrenchment claim and find it without merit in the context of the alleged facts. It would be a novel result under present law to hold that the potential "self-interest" that the directors might have in ingratiating themselves to continuing GM shareholders is a proper basis to rebut the business judgment rule.

In most circumstances Delaware law routinely rejects the notion that a director's interest in maintaining his office, by itself, is a debilitating factor.[88] Even in the more extreme situation where directors allegedly engage in defensive actions to thwart the advances of a hostile bidder (e.g. the *Unocal* context),[89] the business judgment rule is not automatically rebutted. The court merely engages in an additional inquiry, i.e., heightened scrutiny. In the present case the "entrenchment fear" must at least be an order of magnitude less severe. The major distinction here is that, unlike the *Unocal* scenario where directors' offices are potentially imminently threatened (i.e., if a proxy contest occurs the incumbent directors may be out of a job), none of GM's directors would lose their position after the consummation (or failure) of the split-off. In fact, even if the GM directors negotiated an

---

87. Consent Solicitation at 40.

88. *See Lewis v. Straetz,* Del. Ch., C.A. No. 7859, 1986 WL 2252, Hartnett, V.C., (Feb. 12, 1986) (holding that outside directors did not suffer from debilitating self-interest where an acquiror stated his intention to retain those directors following the consummation of the acquisition); *accord Moran v. Household Int'l,* Del. Ch., 490 A.2d 1059, 1074, *aff'd,* Del. Supr., 500 A.2d 1346 (1985) (holding that the mere fact that directors are paid for their services does not impugn their ability to act); *see generally Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1380 (1995).

89. *See supra* text at 1112–13.

extraordinarily lousy deal for the continuing shareholders they would not suffer any immediate threat to their corporate office. Thus, the nexus between the theoretical benefit that the GM directors might achieve for the continuing shareholders and the directors' theoretically related entrenchment motivation is simply too tenuous.

Finally, it seems perfectly reasonable for the GM board to decide that the GM corporation should be in charge of its own IT systems and that, absent the Capital Stock Committee's oversight powers, there should be some new fairness mechanism to regulate the working relationship between EDS and GM after the split-off. In light of these factors, I conclude that the board's actions fit squarely under business judgment rule protection.

### 2. *Shareholder Ratification*

By determining that the split-off transaction was not imposed by an overpowering controlling group or individual and that Class E stockholders had effective mechanisms to shield them from fear of retribution if they did not acquiesce, the facts alleged by this case fall under the last category of duty of loyalty cases described above.[90] Put simply, so long as the shareholder vote to approve or disapprove the transaction was made on a fully-informed, non-coerced basis, that vote operates *ex proprio vigore* as an independent foundation for the application of the business judgment rule. Of course, plaintiffs may defeat the business judgment rule's presumptions—on both process and ratification grounds in this case—by alleging materially false or misleading statements in the disclosure statements on which the vote was predicated.

### 3. *Disclosure Claims*

Not surprisingly, plaintiffs do indeed allege that the Consent Solicitation was materially misleading and unfairly coercive. In particular, plaintiffs claim: 1) the use of the "base case scenario" for comparing EDS's projected performance under the transaction, as opposed to projected performance absent the transaction, was purposefully misleading; 2) defendants failed to disclose that EDS would be substantially more vulnerable to market conditions and revenue decreases following the split-off; 3) defendants misled shareholders by touting potential benefits that were nothing more than illusory; 4) the Consent Solicitation's mention of the Class E stock 120 percent recapitalization right concealed its potential value and was insufficient to inform shareholders that consent was an effective waiver or modification of that right; and, finally, 5) the Consent Solicitation was wrongfully coercive.

The consummation of the split-off of EDS was contingent upon obtaining the approval of a majority of the holders of each of (1) GM 1-2/3 stock, voting separately as a class, (2) GM Class E common stock, voting separately as a class, and (3) all classes of common stock, voting together. The approval of each of these groups of GM shareholders was obtained, and plaintiffs challenge the validity of that shareholder vote. Before beginning an analysis of plaintiffs' specific claims regarding the allegedly materially misleading, deficient, and wrongfully coercive nature of the Consent Solicitation, it would be helpful to review the governing law on this subject.

 When dealing with ratification and disclosure issues, courts inquire as to the type and quality of information in shareholders' hands prior to the vote.[91]

---

90. *See supra* text at 1114–17.

91. *See generally Malone v. Brincat*, Del.Supr., 722 A.2d 5, 10–12 (1998) (agreeing, generally, with the stated proposition and holding that "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances").

Whether shareholders are "fully informed" turns upon whether directors have complied with their duty "[w]hen seeking the affirmative vote of shareholders . . . to disclose all material information."[92] The standard of materiality, while analyzed in light of specific allegations brought in each case, is well settled: A "fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote."[93] A faulty disclosure claim must establish "a substantial likelihood, that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder."[94] To state a cognizable disclosure claim it is insufficient that information might render a communication to shareholders "somewhat more informative."[95]

 The determination of the materiality of an alleged omission or misstatement "requires a careful balancing of the potential benefits of disclosure against the resultant harm."[96] The theory goes that there is a risk of information overload such that shareholders' interests are best served by an economy of words rather than an overflow of adjectives and adverbs in solicitation statements.[97]

 In their analyses of Delaware's disclosure jurisprudence, there appears to be some dispute among the litigants over who bears the burden of proof on disclosure issues. The answer is that it depends on which type of disclosure claim is made by whom. As far as claims of material misstatements, omissions and coercion go, the law is clear that plaintiff bears the burden of proof that disclosure was inadequate, misleading, or coercive.[98] On the other hand, when it comes to claiming the sufficiency of disclosure and the concomitant legal effect of shareholder ratification after full disclosure (e.g., claim extinguishment, the retention of the business judgment rule presumptions, or the shift of the burden of proof of entire fairness from the defendant to the plaintiff) it is the defendant who bears the burden.[99]

 This case implicates, to some degree, both types of claims. Defendants argue the affirmative defense that plaintiffs' first and third counts should be dismissed because all of the shareholders, collectively and as individual classes, approved the challenged transaction following full disclosure of all material facts and without wrongful coercion. For the rea-

**92.** *In re Santa Fe Pacific Shareholder Litig.,* Del.Supr., 669 A.2d 59, 66 (1995); *see also Arnold v. Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1277 (1994); *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84–85 (1992); *Rosenblatt v. Getty Oil Co.,* Del. Supr., 493 A.2d 929, 944 (1985).

**93.** *Loudon v. Archer–Daniels–Midland,Co.,* Del.Supr., 700 A.2d 135, 143 (1997); *Arnold,* 650 A.2d at 1277; *Rosenblatt,* 493 A.2d at 944.

**94.** *Loudon,* 700 A.2d at 143; *Santa Fe,* 669 A.2d at 66; *Arnold,* 650 A.2d at 1277.

**95.** *Kahn v. Lynch Communication Sys., Inc.,* Del.Supr., 669 A.2d 79, 89 (1995).

**96.** *Arnold,* 650 A.2d at 1279; *see also id.* at 1282; *In re Vitalink Communications Corp. Shareholders Litig.,* Del. Ch., C.A. No. 12085, at 28, 1991 WL 238816, Chandler, V.C. (Nov. 8, 1991) (Mem.Op.), *aff'd,* Del.Supr., No. 468,

1991, 610 A.2d 725, Holland, J. (Apr. 30, 1992) (ORDER), *cert. denied,* 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 124 (1992).

**97.** "The law ought guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure" in light of the fact that "in some instances the opposite will be true." *Zirn v. VLI Corp.,* Del. Ch., C.A. No. 9488 at 10, 1995 WL 362616, Allen, C. (June 12, 1995) (Mem.Op.), *aff'd* Del.Supr., 681 A.2d 1050 (1996) (intermediate history omitted).

**98.** *See Loudon,* 700 A.2d at 140–41; *Klang v. Smith's Food & Drug Ctrs., Inc.,* Del. Ch., C.A. No. 15012, at 13, 1997 WL 257463, Chandler, V.C. (May 13, 1997) (Mem.Op.) ("The burden of demonstrating that omissions were material rests with the plaintiff."), *aff'd,* Del.Supr., 702 A.2d 150 (1997).

**99.** *See Citron,* Del. Ch., 584 A.2d at 502–03 (1990).

sons I outlined above,[100] full disclosure and stockholder ratification absent wrongful coercion operates in this context to ensure business judgment protection for the GM board.

To summarize: After reviewing the defendants' disclosures, I conclude that the disclosures appraised the shareholders of all material information, and nothing indicates to me that any disclosure was intended to, or actually did, wrongfully coerce shareholder ratification. Thus, defendants have made a sufficient showing of shareholder ratification after full and proper disclosure to maintain application of the business judgment rule. I now turn to plaintiffs' specific claims in order to explain my conclusion.

### a. Misleading Base Case Scenario Claims

Plaintiffs challenge the Consent Solicitation's comparison of the terms of the MSA which would govern the post-split-off relationship between GM and EDS with the terms anticipated if the split-off was not approved. In other words, plaintiffs would have preferred that the comparison be made between the then-existing service agreement and the new MSA rather than the comparison actually presented between the "base case scenario" and the new MSA.

According to plaintiffs, this comparison was misleading because it was based upon the arbitrary assumption that most of the changes to be made to the MSA if the split-off were approved would have been made even if there were no split-off. It is important to note that plaintiffs do not allege that this assumption was not clearly stated. Nor do plaintiffs allege that there is any meaningful chance that there would be no changes to the MSA.

Plaintiffs' position is incorrect as a matter of law. Given the extensive amount of detailed information given to shareholders, "[a]dditional information comparing and contrasting the [proposed transaction] with a hypothetical [set of circumstances] was not material and would have yielded little benefit at the cost of added complexity." [101] Here, the Consent Solicitation states that "both EDS management and General Motors management advised the EDS Team Financial Advisors that certain changes would have been made to the Existing Master Services Agreement commencing in 1996 even in the absence of the Split-off," and that "EDS management identified to the EDS Team's Financial Advisors those changes that EDS management believed would have been made ... in the absence of the Split–Off." [102] In addition to disclosing these assumptions, the Consent Solicitation discloses EDS's expectation that the contemplated changes in the forward-going EDS/GM relationship "could reduce [EDS's] 1996 earnings per share by as much as $0.07 to $0.14," and that the "long-term impact" of the changes "may have an adverse effect on operating margins unless EDS is able to effect reductions in the costs of providing services to General Motors." [103] In addition, EDS's financial advisors specifically qualified their fairness opinion to state that if no changes were made to the MSA, cash flows to EDS "would have been significantly larger than under the analyses ... conducted." [104]

Because shareholders were informed of: 1) the type of analyses undertaken; 2) the active role the GM board and the Capital Stock Committee took in orchestrating the process and the goals of the negotiating teams; and 3) the risk of decrease in earnings, and because it was plainly obvious that inherent in those analyses were assumptions about the nature and extent

---

100. *See supra* text at 1113–17.

101. *In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr. 669 A.2d 59, 67 (1995).

102. Consent Solicitation at 60.

103. *Id.* at 90.

104. *Id.* at B–8.

of changes in the MSA, plaintiffs do not make a case for why additional hypotheticals should have been employed. To the extent that some changes to the MSA were inevitable (and plaintiffs do not argue otherwise), it is obvious that a comparison between the split-off, and the state of affairs that certainly would not have persisted, would provide little useful information to shareholders and may have served to obfuscate matters.

### b. Illusory Claimed Benefits Claims

Plaintiffs contend that statements made in the Consent Solicitation concerning potential benefits of the split-off transaction were merely illusory and therefore misleading. Among other benefits, the Consent Solicitation claims that there might be a bump in the value of the stock in the range of $0 to $172 considering that it will no longer be a derivative security.[105] In addition, the Consent Solicitation claims that there might be a 1 .5% to 2.5% bump in the company's market capitalization if EDS shares are included on the Standard & Poor's 500 listing.[106] Further potential increases in value from new business and strategic opportunities were claimed that might amount to benefits in the hundreds of millions of dollars.[107]

Plaintiffs' allegation requires the Court to examine the assurances that were attached to any perceived future benefit. Defendants correctly point out that all of the allegedly "illusory" benefits were qualified, if not vitiated, by explicit and non-obscure language. For instance, the lower end of the derivative stock differential range is $0. I doubt that a reasonable investor would have too many illusions as to the meaning of that statistic. The Con-

sent Solicitation goes on to caution that "there could be no assurance that EDS would be included in the Standard & Poor's 500 index."[108] In addition, the Consent Solicitation provides that "no assurance" can be given that EDS would achieve new market opportunities or strategic alliances.[109]

▮▮▮ Plaintiffs' response is that defendants' statements create a false impression and that such an impression cannot be sterilized by "boilerplate" qualifying language. But our cases have held that directors should not be "forc[ed] . . . to bury the shareholders in an avalanche of trivial information."[110] Otherwise, shareholder solicitations would become "so detailed and voluminous that they will no longer serve their purpose."[111] Where clear and explicit language has the incontrovertible effect of changing or modifying meaning, I cannot ignore that meaning. This is true even if such qualifying language is routinely employed in disclosure statements that tout potential benefits. Allegations that benefits claimed are illusory cannot stand where the actual language employed clearly warns that they may not materialize. Thus, even though some or all of the predicted benefits did not materialize, that failure is of no legal consequence considering that there were no assurances or guarantees of success.

### c. Increased Vulnerability Claims

▮▮▮ Plaintiffs also allege that GM failed to adequately inform shareholders that EDS would be substantially more vulnerable to revenue decreases because it would have to rely more heavily on non-GM-related business to make up for the decreased revenue due to the renegotiation

---

105. *Id* at 62.

106. *See id.* at 65.

107. *See id.*

108. *Id.*

109. *Id.*

110. *Behrens v. United Investors Management Co.*, Del. Ch., C.A. No. 12876, at 20, 1993 WL 400209, Allen, C. (Oct. 1, 1993) (Mem.Op.) (citation omitted).

111. *TCG Sec., Inc. v. Southern Union Co.*, Del. Ch., C.A. No. 11282, at 18, 1990 WL 7525, Chandler, V.C. (Jan. 31, 1990).

of the MSA. Here, too, the Consent Solicitation specifically addresses the substance of plaintiffs' complaint.

Under large print and bold type headings such as "**RISK FACTORS REGARDING EDS AFTER THE SPLIT–OFF**," "**Dependence on Major Customer; Changes in Pricing and Terms**," "**EDS MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS FROM OPERATIONS**," and "**Effect of the Split–Off**," the Consent Solicitation explicitly warns of the potentially adverse impacts of the changes in the MSA.[112] It is unclear how plaintiffs could have missed these sections. It would seem that the relevant facts were disclosed and their effects were obvious.[113]

### d. Wrongful Coercion Claims

Plaintiffs point to two different statements concerning the alleged wrongful coercion of the Consent Solicitation. First, plaintiffs object to GM's statement that even if the split-off were not approved, GM would seek substantial changes to the MSA. Second, plaintiffs note GM's statement that it would not consider a transaction that would trigger the Class E stockholders' right to the Exchange Rate.

■ The standard governing a coercion claim is undisputed. Two leading Delaware Supreme Court cases define "wrongful coercion" as where disclosure of certain facts causes shareholders to vote in a certain way for reasons other than those related to the merits of the transaction.[114] All disclosure of material information may cause shareholders to vote in a particular

way, and so is, in some general sense, "coercive." Considering the legal imperative that all shareholders be armed with all material information, it cannot be that the mere potential to influence a shareholder's vote renders disclosed information actionable.[115]

■ Here the statements that the plaintiffs allege are coercive "merely presented to the stockholders material information required as a matter of full disclosure so that they could determine the relative merits" of the split-off.[116] Plaintiffs do not allege that absent the split-off no changes to the MSA would have been negotiated. Nor do plaintiffs point to any statement by GM to the effect that it would have forced the renegotiation of the MSA irrespective of whether such changes were in the best interests of EDS or the Class E stockholders. As far as I can tell, all statements regarding the renegotiation of the MSA were an acknowledgement of a change in business climate and the concomitant need to re-evaluate the existing service relationship between GM and EDS. This information is clearly relevant and may have had an effect on how shareholders voted, but I cannot conclude that it was disclosed in order to force shareholders to vote on anything other than the merits of the transaction.

With respect to the GM board's alleged refusal to engage in any transaction that might trigger the Exchange Rate, plaintiffs have not pointed to any publicly disclosed document that explicitly states that GM directors would *never* consent to a transaction that might trigger the Exchange Rate provision. One particular

---

112. Emphasis in original.

113. *See Kahn v. Tremont Corp.*, Del. Ch., C.A. No. 12339, at 40–41, 1996 WL 145452, Allen, C. (Mar. 21 1996) *rev'd on other grounds*, Del.Supr., 694 A.2d 422 (1997) (stating that "general and commonly understood" facts need not be disclosed); *Meyer v. Alco Health Servs. Corp.*, Del. Ch., C.A. No. 11213, at 7, 1991 WL 5000, Berger, V.C. (Jan. 17, 1991) (Mem.Op.) ("[T]here is no duty to disclose

facts that are known or reasonably available to the stockholder.").

114. *See Brazen v. Bell Atl. Corp.*, Del.Supr., 695 A.2d 43, 50 (1997); *Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1382–83 (1996).

115. *See Brazen*, 695 A.2d at 50.

116. *Williams*, 671 A.2d at 1383.

section of the Consent Solicitation to which plaintiffs point is as follows: [117]

> In considering a divestiture of EDS, the GM Board determined that any such transaction should be one that would both be tax-free ... and not result in a recapitalization of the Class E Common Stock ... at the 120% exchange ratio .... This determination was based on the GM Board's belief that the payment by General Motors of either the 20% premium on the Class E Common Stock resulting from the exchange ratio or a material tax on an EDS divestiture would not be in the best interests of General Motors and its stockholders and that payment of the 20% premium in the context of a split-off of EDS would not be consistent with the purpose for which the 120% exchange rate provision was included in the terms of the Class E Common Stock.[118]

It is hard to see how this statement is wrongfully coercive. Plaintiffs claim that the statement is insufficient because it fails to inform shareholders of why the Exchange Rate provisions exist in the first place so that the shareholders could better understand the GM board's reasoning. Plaintiffs' assumption that shareholders are ignorant about their stockholdings is an unacceptable initial proposition. The Court begins from the basic premise that shareholders have *at least* a basic understanding of the attributes of their stock and how those attributes serve to benefit the shareholders.

In addition, it is clear from the quoted language that irrespective of the "purpose for which the 120% exchange rate provision was included" in the first place, a shareholder who planned to vote in favor of the transaction would thereby forfeit some benefit to which his Class E stock would otherwise be entitled. Thus, the Class E stockholder who voted on the transaction would necessarily understand that at issue was the choice of giving up some right with an easily calculated value (a 20% premium over the stock price) in exchange for the merger consideration. In either event—whether that shareholder voted for or against the transaction—he would be voting on the merits and not because this disclosure introduced some other reason. These disclosed facts may or may not have led some shareholders to vote in favor of the split-off. So long as the disclosure enabled shareholders to vote on the merits of the transaction, I am satisfied that no exhaustive explanation of the original purpose for the Exchange Rate was required. Therefore, I dismiss plaintiffs' wrongful coercion claim.

In sum, I dismiss all of plaintiffs' claims relating to disclosure violations. The full disclosure of the steps in the process and the economics of the deal revealed the plaintiffs' alleged wrongs. In fact, a not-so-close reading of plaintiffs' compliant in conjunction with the Consent Solicitation would yield the conclusion that much of that complaint simply cuts and pastes language from the disclosure document. Even if one might conclude that the board did not structure each step of the process in an ideal way, irrespective of that conclusion the board nonetheless was honest about it in the sense that it fully disclosed all material information.

### D. Count II—Breach of Contract Claim

In count II of their complaint, plaintiffs assert a breach of contract claim under GM's certificate of incorporation. As described in the Background section above, GM's certificate of incorporation provided

---

117. In their complaint, plaintiffs cite to press releases and other statements that communicate the GM board's disinterest in pursuing a split-off that might trigger the Exchange Rate. Like the following example upon which I elaborate, none of these statements would have the effect of coercing Class E stockholders to vote in favor of the transaction. If anything, those shareholders might be more apt to vote against it.

118. Consent Solicitation at 30.

that Class E stockholders were entitled to the 120 percent Exchange Rate in the event of a recapitalization, sale, transfer, assignment, or other disposition of EDS to any entity in which GM was not a majority owner. The split-off would have qualified as a triggering event under the terms of the certificate of incorporation. In addition to claiming that Class E stockholders were entitled to the benefit of that provision, plaintiffs allege that the Consent Solicitation did not sufficiently inform the shareholders that their acquiescence to the split-off under the finalized terms modified their right to the Exchange Rate. Taken together, it appears that plaintiffs do not claim that GM shareholders, including the Class E stockholders, did not have the right under Delaware law to modify the terms of the certificate of incorporation, but that *as presented* by the Consent Solicitation there lies some sort of breach of contract and disclosure violation. This argument, not surprisingly, is murky and difficult to understand.

 There was no breach of contract, and I expressly dismiss count II of plaintiffs' complaint. Here, the contract—GM's certificate of incorporation—was amended as part of the split-off transaction to remove all references to Class E stock, including the right to the Exchange Rate.[119] Obviously, my determination is premised on the legal conclusion that there was sufficient disclosure in the Consent Solicitation to *inform shareholders of the modification to the certificate.*

■ Plaintiffs claim that the consent solicitation was misleading because it implied that the certificate amendment would be an incident of, and not the purpose of, a vote on the split-off. This argument loses all of its force in light of the statements made in the section of the Consent Solici-

tation covering the "Summary Comparison of Class E Common Stock and EDS Common Stock".[120] That section explicitly states, among other things:

> As a result of the Merger, the General Motors Certificate of Incorporation will be amended so that the Split-off will not result in any such recapitalization.[121]

This statement is repeated nearly verbatim on page 132 of the Consent Solicitation:

> As a result of the Merger, the General Motors Certificate of Incorporation will be amended so that the Split–Off will not result in any recapitalization of Class E Common Stock at the 120% exchange ratio.

In light of these statements and the openly disclosed mechanics of the split-off transaction, I hold that, as a matter of law, shareholders who voted in favor of the split-off had full disclosure of all of the issues surrounding the modification to the Class E stockholder's entitlement to the Exchange Rate.

## V. CONCLUSION

Since the facts alleged do not overcome the presumptions of the business judgment rule, and since I do not find a breach of contract, I conclude that full dismissal of each of the counts is appropriate at this stage.

Counsel shall confer and agree upon a form of order to implement this decision.

---

119. Such an amendment is a normal procedure under Delaware law. *See* 8 *Del. C.* § 242.

120. Consent Solicitation at 9–10.

121. *Id.*