# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ANAPLAN, INC. | ) | CONSOLIDATED |
| STOCKHOLDERS LITIGATION | ) | C.A. No. 2022-1073-NAC |

## MEMORANDUM OPINION

Date Submitted: September 26, 2023
Date Decided: June 21, 2024

Gregory V. Varallo, Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Ned Weinberger, Mark Richardson, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; David Schwartz, John Vielandi, LABATON KELLER SUCHAROW, New York, New York; *Counsel for Lead Plaintiff Pentwater Capital Management LP.*

Gregory V. Varallo, Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Aaron T. Morris, Leonid Kandinov, Andrew W. Robertson, MORRIS KANDINOV LLP, New York, New York; *Counsel for Additional Plaintiffs Brotherhood of Locomotive Engineers and Trainmen Long Island Pension Fund.*

Edward B. Micheletti, Sarah R. Martin, Ryan M. Lindsay, Lauren M. Griffith, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Robert Beauchamp, Susan Bostrom, Frank Calderoni, Vikas Mehta, Gary Spiegel, and Suresh Vasudevan.*

**COOK, V.C.**

This case raises fascinating questions of fiduciary law, which I have given extended consideration. I conclude, however, that resolution of those questions, as interesting as they may be, is unnecessary to resolve the case before me. Even assuming the plaintiff has stated a direct claim, the claim fails under ordinary *Corwin* principles.

In March 2022, Anaplan Inc. ("Anaplan" or the "Company") entered into a merger agreement with Thoma Bravo, pursuant to which Thoma Bravo would acquire Anaplan for approximately $10.7 billion. According to lead plaintiff and former Anaplan stockholder Pentwater Capital Management LP ("Plaintiff"), soon after signing the merger agreement, a handful of the Company's directors and officers caused Anaplan to breach the merger agreement by issuing too many equity grants. This enabled Thoma Bravo to negotiate a $400 million haircut—reducing the previously agreed-upon acquisition price from $66.00 per share to $63.75 per share. Anaplan submitted the revised merger agreement to its stockholders, who voted to approve the transaction.

Anaplan's stockholders received a substantial premium for their shares in the merger. Plaintiff, however, brings this putative class action against the Anaplan directors and officers it alleges were responsible for the post-signing equity grants, seeking to recover the $400 million haircut to the merger price. In doing so, Plaintiff suggests multiple avenues for seemingly novel applications of our law. I have spent considerable time analyzing each. The parties have tangled over whether Plaintiff's claims are direct or derivative; whether Plaintiff adequately states a fiduciary duty

1

claim premised on an alleged breach of contract; whether, in the alternative, a stockholder may invoke *Revlon* for non-board action and for an alleged failure to maintain stockholders' (conditional) entitlement to a merger premium. Even assuming that I resolve these questions in Plaintiff's favor, the outcome remains the same. The Anaplan stockholders, via an informed and uncoerced vote, overwhelmingly approved the renegotiated transaction. Applying *Corwin*, Plaintiff's claims must therefore be dismissed.

## I.    FACTUAL BACKGROUND

I draw the relevant facts from the Verified Complaint (the "Complaint") and the documents incorporated by reference or integral to it.[1]

### A. The Parties

Plaintiff names three former Anaplan officers as defendants: Frank Calderoni, Vikas Mehta, and Gary Spiegel (the "Officer Defendants").[2]  Calderoni served as Chief Executive Officer, President, and the Chairman of Anaplan's board of directors (the "Board").[3]  Mehta served as the Company's Chief Financial Officer, and Spiegel

---

[1] *In re Anaplan, Inc. S'holders Litig.*, C.A. No. 2022-1073-NAC, Docket ("Dkt.") 1 ("Compl."). I also consider documents that are "incorporated by reference" or "integral" to the Complaint at the motion to dismiss stage. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Accordingly, I consider many of the exhibits attached to Defendants' Opening Brief in Support of the Motion to Dismiss. Dkt. 18 ("Defs.' Opening Br."). This includes the original and revised merger agreement and proxy statements. Citations in the form of "Tr. __" refer to the transcript of oral argument on the motion to dismiss. Dkt. 32.

[2] Compl. ¶¶ 18–20.

[3] *Id.* ¶ 18.

served as the Company's General Counsel and Senior Vice President.[4] The Officer Defendants held their positions at the Company at all relevant times leading up to the closing of the transaction.

Plaintiff also names three former Anaplan directors as defendants: Robert Beauchamp, Susan Bostrom, and Suresh Vasudevan (the "Director Defendants" and together with the Officer Defendants, "Defendants").[5] The Director Defendants served as members of the Board's "Compensation Committee," which oversaw the issuance of equity grants.[6]

The Compensation Committee, however, delegated many of its grant-issuing responsibilities to a management committee known as the "Equity Administration Committee."[7] Two of the Officer Defendants, Mehta and Spiegel, served as two of the three members of the Equity Administration Committee.[8] The Equity Administration Committee, in turn, reported to the Compensation Committee and Calderoni.[9]

---

[4] *Id.* ¶¶ 19–20.

[5] *Id.* ¶¶ 21–23.

[6] *Id.*

[7] *Id.* ¶ 76.

[8] *Id.* ¶¶ 19–20, 76. The third member of the Equity Administration Committee, a vice president of the Company, is not named as a defendant in this action.

[9] *Id.* ¶ 76.

**B. The Original Merger Agreement**

As 2021 drew to a close, Anaplan started exploring a potential sale of the Company.[10] Around the same time, activist investors reached out to the Company to encourage a potential sale or other strategic alternative.[11] In February 2022, Anaplan engaged with several potential buyers, including the private equity firm Thoma Bravo.[12] While discussing an acquisition transaction with potential buyers, the Board decided to delay granting equity awards.[13]

Pressure from activist investors continued to mount, and on March 17, 2022, two investors filed a Schedule 13D following their acquisition of a significant stake in the Company.[14] In March 2022, Anaplan and potential buyers discussed possible transaction prices with initial bids ranging from $51.00 per share to $68.00 per share.[15]

On March 20, 2022, Anaplan and Thoma Bravo entered into a merger agreement, whereby Thoma Bravo would acquire Anaplan for $66.00 per share (the

---

[10] *Id.* ¶ 25.

[11] *Id.* ¶¶ 28–29.

[12] *Id.* ¶ 30.

[13] *Id.* ¶¶ 41, 43–44.

[14] *Id.* ¶ 45.

[15] Defs.' Opening Br. Ex. B ("Original Proxy") at 42.

"Original Merger Agreement").[16] The Company's stockholders were slated to receive

approximately $10.7 billion in the transaction.[17]

Section 5.1 of the Original Merger Agreement, titled "Conduct of the Business

Pending the Merger," contained several interim operating covenants. One such

covenant limited the equity awards Anaplan could issue between signing and closing.

Section 5.1(b)(ii) of the Original Merger Agreement provided:

> [T]he Company will not and will not permit any Company Subsidiary to directly or indirectly . . . issue, sell, pledge, dispose of, grant or encumber, or authorize the issuance, sale, pledge, disposition, grant or encumbrance of, any Company Securities, except (A) for the issuance of Company Shares pursuant to exercises of the Company Stock Options or vesting of Company RSUs outstanding on the date hereof and any sales by the Company of Company Shares in connection with Tax withholdings and exercise price settlements upon the exercise of Company Stock Options or vesting of Company RSUs (in each case, in accordance with the terms of the Company Stock Plans and applicable award agreements thereunder as in effect on the date hereof), (B) for any Permitted Liens, and (C) for in transactions solely among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries . . . .[18]

No party argues that the exceptions set forth in subparts (A) through (C) are at issue

here.

Per Section 5.1(b), these restrictions were subject to certain limited exceptions,

only two of which are relevant here. First, Section 5.1(b) identified a prior written

approval exception, namely that the otherwise prohibited acts may be taken "with

---

[16] Compl. ¶ 52; *see generally* Defs.' Opening Br. Ex. C ("Original Merger Agreement").

[17] Compl. ¶ 5.

[18] Original Merger Agreement § 5.1(b)(ii).

5

the prior written approval of Parent or Merger Sub (which shall not be unreasonably withheld, delayed or conditioned) . . . ."[19]

Second, Section 5.1(b) pointed readers to the disclosure schedule with the phrase "except . . . as set forth in Section 5.1 of the Disclosure Schedule" to the Original Merger Agreement.[20] In pertinent part, Section 5.1(b)(ii)(1) of that disclosure schedule provided:

> As part of its customary annual review cycle, the Company may make its ordinary course merit-based equity award grants to employees, directors, officers or independent contractors in the form of Company RSUs in an amount not to exceed $105,000,000 (determined based on the Merger Consideration), no more than $20,000,000 (determined based on the Merger Consideration) of which may be granted in the aggregate to Company employees who are party to a [Change in Control] and Severance Agreement or Executive Offer Letter (or are otherwise officers or management-level employees as determined by the Company in its sole discretion) (provided, that (x) Parent's prior consent will be required on any individual Equity Award Grant to an employee in an aggregate amount in excess of $500,000 (such consent not to be unreasonably withheld, conditioned or delayed) . . . .[21]

The parties heavily negotiated this limit on equity grants; it was among the last issues that Anaplan and Thoma Bravo resolved before entering into the Original Merger Agreement.[22] On May 2, 2022, Anaplan issued a Schedule 14A in preparation

---

[19] *Id.* § 5.1(b).

[20] *Id.*

[21] Dkt. 22 ("Pl.'s Answering Br.") Ex. 1 at 33.

[22] Compl. ¶ 61.

for a stockholder vote on June 9, 2022, to approve the Original Merger Agreement (the "Original Proxy").[23]

## C. Equity Grant Issuances

On multiple occasions in the weeks following the signing of the Original Merger Agreement, Anaplan's Compensation Committee and Equity Administration Committee approved equity grants to existing and new employees.

The Compensation Committee met and approved several equity grants during its April 4, 2022 meeting.[24]  Calderoni and Spiegel both attended the meeting.[25] Notably, the Compensation Committee approved an equity grant to an existing employee while expressly acknowledging that the grant was "subject to approval by Thoma Bravo pursuant to the agreement governing the pending transaction."[26]  The Compensation Committee then approved several additional grants for existing employees and one new hire, but Plaintiff points out that nothing in the meeting minutes suggests the Compensation Committee's approval of these grants was contingent on Thoma Bravo's consent.[27]

During its April 4 meeting, the Compensation Committee ultimately approved approximately $22 million in equity grants to Anaplan executives, of which Calderoni

---

[23] *See generally* Original Proxy.

[24] Compl. ¶ 66.

[25] *Id.*

[26] *Id.* ¶ 67.

[27] *Id.* ¶ 68.

would receive $9.5 million.[28] After that meeting, Anaplan sought Thoma Bravo's consent to the equity grants since they exceeded the Original Merger Agreement's $20 million limit on grants to executives by $2 million. Thoma Bravo provided its consent on April 8, 2022.[29]

The Company continued granting equity. On April 12, 2022, and May 10, 2022, the Equity Administration Committee approved several additional equity grants for new hires and existing employees.[30]

On May 19, 2022, the Compensation Committee met, again with Calderoni and Spiegel in attendance, and, again, approved additional equity grants for existing employees.[31] At this point, the Company had already surpassed the $105 million cap on equity grants set by the Original Merger Agreement.[32] Since signing the Original Merger Agreement, the Company had issued over $133.5 million in equity grants.[33] Despite having exceeded the limit, Plaintiff alleges Anaplan's Compensation Committee and Equity Administration Committee continued full steam ahead and ultimately approved over $157 million in equity grants.[34] Unlike the first post-signing equity grant discussed above, these subsequent grants were not made subject

---

[28] *Id.* ¶ 72.

[29] *Id.* ¶ 73.

[30] *Id.* ¶ 77.

[31] *Id.* ¶ 79.

[32] *Id.* ¶ 80.

[33] *Id.* ¶¶ 81–82.

[34] *Id.*

to Thoma Bravo's consent.[35]   Plaintiff's allegations suggest that Defendants either expected consent to follow as a matter of course or were guided by the adage that it is easier to ask for forgiveness than permission.[36]

### D. The Revised Merger Agreement

On May 23, 2022, Calderoni contacted Thoma Bravo (1) to obtain its consent to $50 million in equity awards for new hires and (2) to confirm that Thoma Bravo's prior approval of the $22 million executive equity grants increased the total equity allowance from $105 million to $107 million.[37]   That same day, Thoma Bravo responded to Calderoni by email, expressing its disapproval.[38]

On May 27, 2022, Thoma Bravo emailed a letter to Anaplan stating that Anaplan had violated the Original Merger Agreement by exceeding the $105 million grant limit for existing employees and by granting equity to new hires.[39]   After receiving additional documents from Anaplan, Thoma Bravo voiced its frustration with Anaplan granting equity awards in excess of "the heavily negotiated" $105 million limit on such grants.[40]

---

[35] *Id.* ¶ 68.

[36] *Id.* ¶¶ 83, 111.

[37] *Id.* ¶ 85.

[38] *Id.* ¶¶ 87–88.

[39] *Id.* ¶¶ 97–99.

[40] *Id.* ¶ 97.

On June 6, 2022, after further discussions, the parties agreed to amend the terms of the Original Merger Agreement (the "Revised Merger Agreement").[41] Under the Revised Merger Agreement, Thoma Bravo would acquire Anaplan for $63.75 per share rather than the original $66.00 per share.[42] The price change decreased the amount Anaplan stockholders would receive in the transaction by approximately $400 million.[43] The parties also agreed to "waive or otherwise significantly limit the availability of specified closing conditions" and increase the termination fee from $586 million to $1 billion.[44]

On June 10, 2022, Anaplan issued a supplemental Schedule 14A in connection with the Revised Merger Agreement (the "Supplemental Proxy").[45] On June 21, 2022, the Anaplan stockholders approved the Revised Merger Agreement, and the transaction closed the following day (the "Merger").[46]

### E. Procedural History

Plaintiff filed the Complaint on November 23, 2022. The Complaint purports to assert three claims on behalf of a putative class of former Anaplan stockholders: Count I for breach of fiduciary duty against the Officer Defendants, Count II for

---

[41] *Id.* ¶ 100.

[42] *Id.*

[43] *Id.* ¶ 102.

[44] Defs.' Opening Br. Ex. D ("Supplemental Proxy") at 14, 18.

[45] Compl. ¶ 103; *see generally* Supplemental Proxy.

[46] Compl. ¶ 103.

breach of fiduciary duty against the Director Defendants, and Count III for waste against all Defendants.[47] In Counts I and II, Plaintiff alleges that Defendants breached their fiduciary duties by causing Anaplan to breach the Original Merger Agreement and thereby enabling Thoma Bravo to renegotiate for a significantly lower merger price.[48] In Count III, Plaintiff alleges that Defendants' actions amounted to waste, not of corporate assets, but of stockholders' entitlement to the delta between the Original Merger Agreement and the Revised Merger Agreement prices.[49]

Defendants moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim on which relief could be granted (the "Motion").[50]

## II    LEGAL ANALYSIS

As with all motions to dismiss under Rule 12(b)(6),

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (i[v]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[51]

### A. The Parties' Arguments

Plaintiff asserts Defendants breached their fiduciary duties to Anaplan's stockholders in causing Anaplan to breach its interim operating covenants. Plaintiff

---

[47] *Id.* ¶¶ 128–44.

[48] *Id.* ¶¶ 128–38.

[49] *Id.* ¶¶ 139–44.

[50] Dkt. 11.

[51] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted).

alleges approximately $400 million in damages—*i.e.*, the value of the haircut to the merger price. Boiled down, Plaintiff's theory is that Anaplan's stockholders were entitled to $66.00 per share upon consummation of the merger under the Original Merger Agreement, $2.25 per share of which Defendants evaporated due to their bad faith or grossly negligent misconduct.

The parties devoted substantial portions of their briefing and oral argument to whether Plaintiff has standing to assert its claims. According to Defendants, Plaintiff's claims are derivative based on precedent addressing alleged fiduciary misconduct that results in a lower merger price.[52] To state a direct claim, Defendants assert Plaintiff must allege the Merger was unfair;[53] yet Plaintiff does not allege the Merger was unfair. Plaintiff responds that the decisions on which Defendants rely are largely explainable as derivative because the alleged fiduciary misconduct caused an actual diminution in firm value that subsequently, and indirectly, resulted in a reduced merger price. Plaintiff argues, here, Anaplan was not meaningfully harmed by Defendants' conduct. Instead, Plaintiff says Anaplan's stockholders suffered the harm, and its claim must therefore be direct.[54]

---

[52] *See, e.g.*, Defs.' Opening Br. at 29–30; *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004); *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *9 (Del. Ch. Sept. 30, 2009); *Albert v. Alex. Brown Mgmt. Servs. Inc.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005); *Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004).

[53] *See, e.g.*, Defs.' Opening Br. at 30–33; *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1245 (Del. 1999); *Kramer v. W. Pac. Indus.*, 546 A.2d 348, 354 (Del. 1988); *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Tr. for Komen v. Breyer*, 2020 WL 3484956, at *8 (Del. Ch. June 26, 2020).

[54] *Cf. Hot Topics in M&A Practice*, M&A J., March 2024, at 42 (panelists discussing, in breach of merger agreement context, that "if the deal fails, it's hard to figure out the value

Plaintiff's claims are premised on two theories of breach. Plaintiff first alleges Defendants breached clear and unambiguous provisions of the Original Merger Agreement. Plaintiff says that, in doing so, Defendants breached their fiduciary duties. To get there, Plaintiff argues I must infer bad faith for breach of clear and unambiguous contract terms. Defendants counter that the contract terms at issue were not sufficiently clear and unambiguous to permit a pleading stage inference of bad faith. Plaintiff further argues that, even if bad faith cannot be inferred, the Officer Defendants' actions were at least pleading-stage reckless or grossly negligent.

Plaintiff also alleges, in the alternative, Defendants had a continuing *Revlon* duty to obtain *and to maintain* the highest price reasonably available for the Company's public stockholders in the cash-out merger. On this point, Defendants counter that Plaintiff's claim must implicate a majority of the Board, which it does not do.

To put it mildly, the parties have raised very interesting questions. They are not, however, questions I need to answer to resolve the Motion. As I explain below, Plaintiff's claims must be dismissed because they do not survive the informed and uncoerced vote of Anaplan's stockholders approving the Merger.

---

of the detriment to the target" and "it's a misnomer. It's not the value to the target. We've talked about this when *ConEd* first came out. . . . So the breach is the harm to your stockholders. That's why you're acting and doing this contract. And so when we talked about the diminution value of the target, that's irrelevant.").

13

## B. *Corwin*

"*Corwin* cleansing is available only if the transaction is not subject to the entire fairness standard *ab initio*."[55] "[E]ntire fairness review will apply *ab initio*" when a "controller stands on both sides of the deal" or when "the controller stands on only one side of the deal but competes with the common stockholders for consideration."[56] "[W]hen a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[57] In other words, "[w]hen a transaction has been approved by a majority of the disinterested stockholders in a fully informed and uncoerced vote, the business judgment rule applies and '*insulates the transaction from all attacks other than on the grounds of waste*[.]'"[58]

Plaintiff has not alleged the transaction is subject to the entire fairness standard *ab initio*. Accordingly, *Corwin* cleansing is available and will apply if its elements are satisfied.

Plaintiff resists this conclusion by suggesting its claims involve matters that were "extrinsic" to the stockholder vote. *Corwin*, however, enables parties to "avoid

---

[55] *Harcum v. Lovoi*, 2022 WL 29695, at *11 (Del. Ch. Jan. 3, 2022) (citing *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016)).

[56] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (internal quotation marks omitted).

[57] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 309 (Del. 2015).

[58] *Chester Cty. Ret. Sys. v. Collins*, 165 A.3d 286, 286 n.1 (Del. 2017) (emphasis added) (citing *Chester Cty. Ret. Sys. v. Collins*, 2016 WL 7117924, at *2 (Del. Ch. Dec. 6, 2016) (ORDER) (quoting *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1001 (Del. Ch. 2014), *aff'd sub nom. Corwin*, 125 A.3d 304 (Del. 2015))) (TABLE).

14

the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[59] And I do not read our Court's *Corwin* decisions, or the policy rationale underlying *Corwin*, as intended to apply *Corwin* narrowly.

So long as a stockholder vote under *Corwin* applies to cleanse the deal process leading to a merger that equity owners choose to accept, I see no basis to demarcate artificially Defendants' actions here in the handful of weeks between signing the Original Merger Agreement and negotiating and signing an amendment to that agreement. Even Plaintiff itself asserts, in responding to Defendants' standing arguments, that "Defendants' breaches were *part and parcel to the merger process* and caused the reduction in the [t]ransaction consideration that [Thoma Bravo] otherwise agreed to pay."[60]

I therefore turn to the elements required to extinguish Plaintiff's claims. Plaintiff asserts Anaplan's stockholders were uninformed and the vote was coerced. I address each in turn and then discuss Plaintiff's waste claim in Part II(C), below.

### 1. Fully Informed

Plaintiff claims that although the stockholders approved the Revised Merger Agreement, they lacked material information. Defendants, on the other hand, point to the substantial disclosures in the Supplemental Proxy and argue that the stockholders were indeed fully informed.

---

[59] *Corwin*, 125 A.3d at 313.

[60] Plaintiff's Answering Br. at 41 (emphasis added).

Under Delaware law, when directors solicit stockholder action, they must "disclose fully and fairly all material information within the board's control."[61] "'Material' does not mean 'everything.'"[62]  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[63]  Notably, the standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote[,]" but instead asks whether there is "a substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[64] "Redundant facts, insignificant details, or reasonable assumptions need not be disclosed."[65]  Nor is information material simply because "it would be helpful, or interesting" to stockholders.[66]

Plaintiff bears the burden of pleading a disclosure violation and "must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable

---

[61] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).

[62] *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *10 (Del. Ch. Jan. 31, 2023).

[63] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[64] *Id.*

[65] *In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017).

[66] *Id.*

16

stockholder."[67] Plaintiff bears this burden, at least in part, because placing the burden on Defendants "would create an unworkable standard, putting a litigant in the proverbially impossible position of proving a negative."[68] Once Plaintiff has identified a deficiency, the burden shifts to Defendants, who must "establish that the alleged deficiency fails as a matter of law."[69] "So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment."[70]

Immediately up front in the Supplemental Proxy, the Board set forth its position, which was readily understandable to any stockholder reading it—that the Board believed the Company and its directors and officers had acted in good faith and in compliance with the Original Merger Agreement,[71] but that a *bona fide* dispute had arisen with Thoma Bravo on that issue.[72] Stockholders would further understand that, rather than continue to dispute the issue and risk losing the deal,

---

[67] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

[68] *Solera*, 2017 WL 57839, at *8.

[69] *Id.* ("It instead is far more sensible that a plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote.").

[70] *City Pension Fund for Firefighters & Police Officers in City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959, at *16 (Del. Ch. July 29, 2022) (quoting *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009)).

[71] Supplemental Proxy at 7.

[72] *Id.*

17

the Board made the business judgment that it was in the best interests of Anaplan and its stockholders to agree to a price reduction in return for securing the still-premium transaction and enhanced closing certainty.[73] This explanation was followed by an additional eight pages laying out in substantial detail the Board's position, Thoma Bravo's position, the dispute between the counterparties, and the negotiations over an amended merger agreement over a roughly two-week period.[74]

Anaplan stockholders had the material information they needed—including, most importantly, about the price—to make an informed decision whether or not to vote in favor of the Revised Merger Agreement.[75]

Plaintiff's Complaint alleges disclosure deficiencies.[76] Defendants address these *at length* in their opening brief.[77] Plaintiff chooses not to engage with Defendants' arguments in its answering brief. As I am unable to improve on Defendants' reply on this point, I quote it in full:

---

[73] *Id.*

[74] *Id.* at 7–15.

[75] *See, e.g., In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *16 (Del. Ch. Aug. 31, 2020) (describing price as "the most important detail of the Acquisition"); *cf.* James C. Freund, *Anatomy of a Merger: Strategies & Techniques for Negotiating Corporate Acquisitions* § 3.2, at 56 (1975) ("[T]he subject of purchase price [is] obviously the single most important aspect of any acquisition transaction."); *id.* § 6, at 175 ("In spite of all the legalistic paraphernalia of modern acquisitions . . . the purchase price remains the most venerable indicium of a gratifying deal."); Lou R. Kling et al., *Negotiated Acquisitions of Companies, Subsidiaries & Divisions* § 1.05[1], at 1-40.1 (2023) (describing the terms of a merger agreement and specifying that price and form of consideration are potentially "the most important in the entire agreement").

[76] Compl. ¶¶ 106–117.

[77] Defs.' Opening Br. at 50–60.

18

In the Opening Brief, Defendants established that each alleged disclosure violation is not well-pled. [(*Id.*)] The Opposition does not respond to Defendants' arguments explaining why Plaintiffs failed to plead a disclosure violation, nor do Plaintiffs address the cases cited in the Opening Brief. Instead, Plaintiffs regurgitate the allegations in the Complaint. Plaintiffs' failure to attempt to meet their pleading burden is a waiver that the vote was not fully informed. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Even if Plaintiffs did not waive their disclosure claim, as demonstrated in the Opening Brief, the stockholder vote was fully informed. The Supplemental Proxy included eleven pages of additional background and analysis concerning the equity-related events, the Board's review of those events and its recommendation, after which 98.8% of stockholders voting approved the sale. *Corwin* compels dismissal of the Complaint.[78]

I agree. With Plaintiff having essentially abandoned the field, it is not this Court's responsibility to tilt at windmills. Defendants have amply shown why the disclosures satisfy *Corwin*, and Plaintiff does not provide a basis to conclude otherwise.[79]

### 2. Uncoerced

Plaintiff next asserts—hyperbolically—that the vote was coerced because "stockholders had a metaphorical gun to their head" when asked to approve the

---

[78] Dkt. 29 ("Defs.' Reply Br.") at 29–30 (footnotes omitted). Defendants' concluding footnote correctly points out that "Plaintiffs' citation to cases for the proposition that disclosures must provide full information on the topics on which the Board speaks is untethered to any alleged disclosure deficiency." *Id.* at 30 n.15.

[79] With admirable candor, even Plaintiff's counsel acknowledged at oral argument that, "because they couldn't do anything about it[,]" Anaplan's "stockholders didn't really care that much exactly what happened that necessitated the renegotiation . . . ." Tr. 86:1–7 (discussing disclosures).

Revised Merger Agreement.[80]  Plaintiff urges the Court to deem the transaction, as presented to stockholders, either situationally or structurally coercive.  But an uncoerced vote simply gives stockholders a "free choice between maintaining their current status and taking advantage of the new status offered by" the proposed transaction.[81]  "The status quo may be undesirable or unpleasant, but that fact does not render the transaction coercive."[82]

### a. Situational Coercion

"Situational coercion arises when the status quo is so unattractive that it prevents a stockholder vote from operating as a clear endorsement of a transaction."[83] It is "[t]he situational backdrop of an unacceptable status quo [that] calls into question the meaning of a stockholder vote such that it should not be given cleansing effect."[84]  Indeed, "a status quo can be sufficiently unattractive to prevent a stockholder vote from operating as a clear endorsement of a transaction and therefore having a cleansing effect."[85]

---

[80] Compl. ¶ 105.

[81] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999).

[82] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *25 (Del. Ch. June 11, 2020) (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1131–32 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 1999) (TABLE)).

[83] *Smart Loc. Unions & Councils Pension Fund v. BridgeBio Pharma, Inc.*, 2022 WL 17986515, at *20 (Del. Ch. Dec. 29, 2022) (citing *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *15–16 (Del. Ch. Mar. 31, 2017)), *aff'd*, 303 A.3d 51 (Del. 2023).

[84] *Dell*, 2020 WL 3096748, at *27.

[85] *Id.* at *26.

20

Although at a discount to the Original Merger Agreement, the Revised Merger Agreement still reflected a substantial premium both to Anaplan's unaffected share price and to its expected share price if stockholders voted not to approve the Merger. Plaintiff asserts that, in the latter case, stockholders would have expected Anaplan's share price to fall significantly below the unaffected price due to a broader drop in the trading price for "companies in Anaplan's industry" following the signing of the Original Merger Agreement.[86] Defendants characterize Plaintiff's situational coercion argument as boiling down to an assertion that the revised deal premium was still "so good" relative to voting down the Merger, "it has to be coercive."[87]

To be sure, a stockholder would prefer more money for her shares to less, all things being equal. This would seem to hold true in all transactions involving rational economic actors. But it does not follow that a merger, or the vote thereon, is situationally coercive under our law simply because the merger offers a premium relative to the expected trading price for shares if stockholders do not approve the deal.

Anaplan stockholders had a choice to accept the revised merger or to vote it down and thereby retain their shares in the standalone company. Plaintiff does not

---

[86] Compl. ¶ 9 ("The deal was announced as market valuations of companies in Anaplan's industry were on a downward trend. The market deteriorated even more rapidly after the deal became public . . . ."); Pl.'s Answering Br. at 48; *see also* Tr. 86:7–11 ("All they really were tasked with assessing was whether to accept the Revised Merger Agreement of $63.75 a share or turn it down and return to a stand-alone option that they were being told was depressed due to macroeconomic changes.").

[87] Tr. 34:15–17.

allege the Company, or its shares, would be worthless or even materially impaired in terms of their intrinsic value. Anaplan stockholders had the opportunity to retain an interest in a multibillion-dollar company with significant revenue.[88] The difference between good, better, and best here is not grounds for situational coercion.

### b. Structural Coercion

"[A] structurally-coerced vote is simply a vote structured so that considerations extraneous to the transaction likely influenced the stockholder-voters, so that [the Court] cannot determine that the vote represents a stockholder decision that the challenged transaction is in the corporate interest."[89] As this Court cautioned in *Sciabacucchi*, however, the concept of structural coercion does not provide "a license for plaintiffs to pick apart factors in stockholder votes to nullify ratification."[90]

Unlike the stockholders in *Sciabacucchi*, Plaintiff does not allege self-dealing or other extraneous factors that might warrant calling upon the principle of structural coercion.[91] If anything, Plaintiff's beef here seems to be with the notion of

---

[88] Plaintiff's logic suggests a dangerous path, in which offering stockholders a choice to accept a significant premium for their shares becomes, by its nature, coercive. At least as I understand it, that is decidedly *not* the intent behind our law on coercion.

[89] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *20 (Del. Ch. May 31, 2017).

[90] *Id.* at *21.

[91] Plaintiff also cites an oral ruling in support of its coercion argument, asserting that Anaplan's stockholders were faced with "a proverbial worst-case scenario[.]" Pl.'s Answering Br. at 48–49 (citing *JB and Margaret Blaugrund Found. v. Guggenheim Funds Inv. Advisors LLC*, No. 2021-1094-NAC, at 25 (Del. Ch. Feb. 22, 2023) (TRANSCRIPT)). But *Guggenheim* is easily distinguishable. There, the complaint adequately alleged the defendants had taken "the status quo off the table as a viable option" and "framed the vote as a choice between the [m]erger and a liquidation[,]" with the latter option having been presented as involving

*Corwin*-cleansing itself. Plaintiff asserts the Anaplan stockholders' overwhelming vote to approve the Merger should not be accorded any cleansing effect because it was bound up in the stockholders' desire to receive a premium for their shares.[92] Plaintiff seems to analogize this to the cross-conditionality present in *Sciabacucchi* and suggests Defendants had to present stockholders with a separate, standalone ratification vote to obtain cleansing effect.[93] In support, Plaintiff points to the 2009 decision in *Gantler v. Stephens*, which pre-dates *Corwin* by six years. The Delaware Supreme Court was obviously aware of *Gantler* when it issued *Corwin*.[94] Indeed, Plaintiff's argument could only make sense to someone who did not live through that era.

Plaintiff's argument seems to suggest that corporations, and our courts, have been missing structural coercion inherent in merger votes for nearly a decade. *Corwin*, however, establishes a framework in which our law respects equity owners'

---

substantial illiquidity and uncertainty over timing and outcome. *JB and Margaret Blaugrund Found. v. Guggenheim Funds Inv. Advisors LLC*, No. 2021-1094-NAC, at 24 (Del. Ch. Feb. 22, 2023) (TRANSCRIPT); *see also JB & Margaret Blaugrund Found. v. Guggenheim Funds Inv. Advisors, LLC*, 2023 WL 2562933, at *2 n.10 (Del. Ch. Mar. 17, 2023), *interlocutory appeal refused*, 294 A.3d 64 (Del. 2023) (TABLE).

[92] Tr. 76:21–77:1 ("And I would submit, again, stockholders were asked to ratify the determination to retrade the merger agreement to enter into the deal, but not asked to ratify defendants' breaches that deprived them the ability to accept the higher price.").

[93] *Sciabacucchi* is also easily distinguishable given the attenuated nature of the transactions that stockholders had to approve cross-conditionally to receive the merger consideration. *Compare Sciabacucchi*, 2017 WL 2352152, at *4 ("The facts are sufficient to an inference that the Liberty Share Issuances (and the Voting Proxy Agreement) were unnecessary to the Acquisitions."), *with* Plaintiff's Answering Br. at 41 ("Defendants' breaches were part and parcel to the merger process[.]").

[94] *See Corwin*, 125 A.3d at 311 (discussing *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009)).

fully informed decision to cash out their shares for a premium via a merger and accords that decision cleansing effect rather than labeling it coercion. That is a very deliberate feature, not a bug, of the system.

Plaintiff's structural coercion argument must, too, be rejected.

## C. Waste

Last, Plaintiff attempts to plead waste as a standalone claim. Because *Corwin* cleansing does not extinguish claims for waste, I address waste here.[95]

Plaintiff sweepingly asserts that "because of Defendants' breaches, stockholders were forced to give up value in exchange for nothing."[96] Stockholders, however, did not get "nothing." The Revised Merger Agreement delivered stockholders $10.4 billion in cash, representing a 41% premium over Anaplan's five-day weighted average stock price before the Original Merger Agreement was announced.[97] In addition, in exchange for agreeing to a price reduction, Anaplan

---

[95] "Under present Delaware law, a fully informed majority vote of the disinterested stockholders that approves a transaction (other than a merger with a controlling stockholder) has the effect of insulating the directors from all claims except waste." *Corwin*, 125 A.3d at 309 n.19 (citing William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. L.J. 1287, 1317–18 (2001)). That said, our courts have also questioned waste as a viable path to recovery in these circumstances. *See, e.g.*, *Singh v. Attenborough*, 137 A.3d 151, 153 n.3 (Del. 2016); *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016).

[96] Pl.'s Answering Br. at 54.

[97] Waste concepts seem especially dissonant when, as here, fiduciaries obtain hefty merger premia for their stockholders. *See, e.g.*, *Ryan v. Buckeye P'rs, L.P.*, 2022 WL 389827, at *9 (Del. Ch. Feb. 9, 2022) (concluding plaintiffs "failed to plead waste–which is not at all surprising given the hefty premium secured in the [t]ransaction"), *aff'd*, 285 A.3d 459 (Del. 2022); *In re MFW S'holders Litig.*, 67 A.3d 496, 519 (Del. Ch. 2013) (noting that a 47% premium transaction could not constitute waste); *In re Ltd., Inc. S'holders Litig.*, 2002 WL 537692, at *9 (Del. Ch. Mar. 27, 2002) (dismissing waste claim in connection with 15% premium transaction).

24

obtained a host of concessions from Thoma Bravo, including waiving certain conditions, limiting the time period for assertion of other breaches, and—in the midst of increasing economic uncertainty—nearly doubling Thoma Bravo's reverse termination fee.[98] This is not "so one sided" that a reasonable person could not conclude that Anaplan received adequate consideration.[99]

Plaintiff devotes only two pages of its answering brief to waste. In doing so, Plaintiff fails to explain how the Board's determination to enter into the Revised Merger Agreement rather than pursue uncertain, costly, and time-consuming litigation to force the acquiror to close is waste, particularly when the revised deal terms provide a 41% premium along with substantially enhanced closing conditions that ensure a swift and certain closing. Plaintiff's short passage on waste cites *In re CBS Corp. Stockholder Class Action & Derivative Litigation*.[100] As Defendants' point out, however, the *CBS* decision reiterates that "Delaware sets a high threshold for waste, which is 'extremely and rarely satisfied.' To constitute waste, 'the company would *literally have to get nothing whatsoever* for what it gave.'"[101] Plaintiff fails to

---

[98] Supplemental Proxy at 14, 18.

[99] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998)).

[100] 2021 WL 268779, at *48 (Del. Ch. Jan. 27, 2021).

[101] *Id.* (emphasis added) (footnote omitted).

state a waste claim because closing certainty, significant premium price, and swiftness coupled with an increased termination fee is not "literally nothing."[102]

\* \* \*

Acquiree fiduciaries are already disincentivized from acting in ways that jeopardize a merger's closing. Although this case presents what some might view as hard facts, it is not at all clear to me that the correct response is to open a new route for director and officer liability.

That said, perhaps with different facts Plaintiff's allegations could have survived a motion to dismiss. But, in this matter, our case law compels dismissal of Plaintiff's claims for the reasons I have described.

### III. CONCLUSION

Accordingly, for the foregoing reasons, each of Plaintiff's claims must be dismissed under Rule 12(b)(6).

---

[102] Plaintiff ignores Defendants' argument that the equity awards were not wasteful. Defs.' Opening Br. at 62. Any such basis for avoiding dismissal is therefore waived.